### DUPLEX PRINTING PRESS CO. v. DEERING et al.

(District Court, S. D. New York. April 23, 1917.)

No. 74.

INJUNCTION &⇒101(2)—FEDERAL COURTS—UNION LABOR ORGANIZATIONS.

Defendants were officers of a labor organization, some of whose members were employed by complainant as machinists in the building of printing presses, for whom defendants endeavored to obtain shorter hours and better wages, which being refused, a strike resulted. There was picketing and efforts made by persuasion to prevent others from work-

ing for complainant, but there was no evidence that violence was used or threatened by defendants. Defendants also tried with more or less success to prevent the sale and the installation by purchasers of complainant's presses, but without violence or threats of violence. *Held*, that the object of such action by defendants was lawful, and that, in the absence of evidence that unlawful means were resorted to for its accomplishment, the fact that defendants' acts resulted in injury to complainant's business did not authorize the granting of an injunction by a federal court under Clayton Act Oct. 15, 1914, c. 323, § 20, 38 Stat. 738 (Comp. St. 1916, § 1243d).

In Equity. Suit by the Duplex Printing Press Company against Emil J. Deering and others. Decree for defendants.

Austin, McLanahan & Merritt, of New York City, for complainant. Frank X. Sullivan, of New York City, and Frank L. Mulholland, of Toledo, Ohio, for defendants.

MANTON, District Judge. The complainant, a manufacturer of printing presses, has its principal place of business at Battle Creek, Mich., and sells its products throughout the United States. The defendants are officers of the International Association of Machinists, and are named as parties defendant individually and in their representative capacities as business agents of the International Association of Machinists and the Riggers' Protective Union, in which they respectively hold offices. They have appeared and answered as individuals, and, it appears, process has not been served upon the associations of which they are the representatives. The relief sought is an injunction restraining and enjoining them from interfering with the complainant's trade and good will, and in preventing the complainant from securing skilled mechanics to carry on its business of producing, hauling, and erecting printing presses for customers in New York state and other states, and in preventing the complainant from securing orders and contracts for the sale and installation of printing presses, and from interfering with the sale, carting, installation, use, or operation of printing presses made by the complainant, and to generally restrain the defendants from doing any and all acts whatsoever in furtherance of a combination or conspiracy charged in the complaint, said to exist for the purpose of accomplishing the acts charged against the defendants. Relief is further asked—

"restraining the defendants from publishing, circulating, or otherwise communicating, either directly or indirectly, in writing or orally, to any person or corporation, any statement or notice of any kind or character whatsoever, calling attention to the fact that the complainant or its business or its products are or were or have been declared unfair, or are on any unfair list, or that the complainant should not be patronized or dealt with, or its printing presses purchased, used, handled, hauled, operated, worked upon, or dealt in, because made in an open or nonunion shop, and from publishing, circulating, or communicating, either orally or in writing, any representation or statement of like effect or import, in any manner that will injure or interfere with the complainant's business, or with the free and unrestricted right of the complainant to dispose of its printing presses and to obtain contracts and orders for printing presses to be manufactured and installed by the complainant; from giving notices verbally or in writing to any person, firm, or corporation to refrain from soliciting, making, or carrying out contracts with complainant for the purchase, carting, installation, operation, exhibition,

advertisement, or display of printing presses made by the complainant, or to refrain from purchasing, hauling, installing, using, handling, or operating printing presses of any kind made by complainant, under threats that if such contracts or purchases are made or carried out, or such work is done, they will cause the person so notified loss, trouble, or inconvenience, or that they will interfere with and prevent the complainant from carrying out said contracts, or that they will cause persons employed by others to do work in connection with said presses, or upon buildings or in connection with exhibitions where said presses are to be displayed, used, or installed, to withdraw from work upon said building or in connection with said exhibitions, or that they will cause persons not to exhibit at said exhibition; and from attempting to prevent the sale, carting, installation, use, operation, exhibition, or display of printing presses manufactured by complainant, or the performance of contracts made by the complainant, by inducing or attempting to induce any person or persons whomsoever to decline employment, or cease employment, or not to seek employment, under any persons, firms, or corporations, or representatives of the complainant engaged in the work of hauling, carting, installing, handling, using, or operating said printing presses for customers, because the complainant does not observe union regulations in Battle Creek, Michigan; and from preventing or attempting to prevent the complainant from exhibiting its said presses at any exhibition or exposition, or advertising said presses, by threatening any persons or corporations having charge of such exposition or advertising, or any person or corporation doing business with them, with labor difficulties or loss of patronage, if your complainant is allowed to exhibit or advertise, and from inducing any person or persons employed by said exposition company or advertising agency, or any person or corporation doing business with them, to cease employment, or to decline employment, or to remain out of employment, of said exhibitors or exposition company as long as the complainant is allowed to take part in said exhibition; and from inducing any person or corporation not to do business with or work for any person or corporation because such person or corporation may have, or purposes to have, or formerly had, business relations with complainant; and from inciting or intentionally causing strikes or labor troubles among men employed by customers, representatives, or agents of the complainant outside of Battle Creek, Mich., where no grievances exist against the complainant or its agents or customers, other than the alleged grievance that the complainant does not operate its factory at Battle Creek, Mich., in accordance with the rules and regulations prescribed by the International Association of Machinists or any of its officers or subdivisions; and from threatening, intimidating, or assaulting persons in the employ of your complainant, or those engaged in hauling, installing, using, handling, or operating machinery manufactured by the complainant, and from making misrepresentations or false statements concerning the labor conditions existing in the complainant's factory, for the purpose of interfering with the complainant in securing skilled mechanics to enter or remain in its employ, or in securing orders and contracts from customers for the sale, installation, and use of printing presses; and from using any and all ways, means, and methods of doing any of the aforesaid forbidden acts, and from doing any of the forbidden acts either directly or indirectly, or through by-laws, orders, directions, or suggestions to committees, associations, officers, agents, or otherwise."

The complaint generally states that the defendants, individually and as officers of the respective labor unions, are attempting to carry on an illegal combination or conspiracy to monopolize the machinists' trade throughout the United States, and to compel employers to operate union shops (where none other than employés of labor unions are engaged), and that by so doing they are interfering with the complainant's business of producing, selling, and installing printing presses. In furtherance of this illegal combination or conspiracy, union men at

work for the complainant have been withdrawn from the work of installing or erecting the complainant's products. Picketing has been resorted to, thus preventing the complainant from employing skilled machinists to take the place of men who have gone out on strike in the complainant's employ, and that misrepresentations and intimidations have been resorted to in furtherance of this plan or conspiracy. It is further alleged that, by circulation of circulars and other means of persuasion, the defendants have directly and indirectly, and through officers and their unions, prevented the hauling or carting and erecting of the printing presses manufactured by complainant, and further that the defendants have prevailed upon prospective customers from purchasing the complainant's printing presses, using in their effort threats to such customers, and with labor difficulties such as strikes, boycotts, and misrepresentations, all of which it has alleged has interfered with the complainant's interstate trade or commerce, as a result of which complainant has been damaged.

There was a strike at complainant's plant in August, 1913. At the trial, there was no dispute as to the three individual defendants representing the respective labor unions or associations, as claimed by the complainant.

There have been many cases before the courts involving for decision the rights claimed by the complainant here. The complainant, following the reasoning of Judge Killits in Stephens v. Ohio State Telephone Co. (D. C.) 240 Fed. 759, decided in February, 1917, in the Northern district of Ohio, urges now that the Sherman Anti-Trust Act (Act July 2, 1890, c. 647, 26 Stat. 209), as amended by Congress on October 15, 1914, is but an enunciation of the then existing law, as to the right of injunction against labor unions, as laid down in the many cases. The sections of the Clayton Act having to do with this subject, are as follows:

Chapter 323, § 6: "The labor of a human being is not a commodity or article of commerce. Nothing contained in the anti-trust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the anti-trust laws." Comp. St. 1916, § 8835f.

Chapter 323, § 20: "No restraining order or injunction shall be granted by any court of the United States, or a judge or the judges thereof, in any case between an employer and employés, or between employers and employés, or between employés, or between persons employed and persons seeking employment, involving, or growing out of, a dispute concerning terms or conditions of employment, unless necessary to prevent irreparable injury to property, or to a property right, of the party making the application, for which injury there is no adequate remedy at law, and such property or property right must be described with particularity in the application, which must be in writing and sworn to by the applicant or by his agent or attorney.

"And no such restraining order or injunction shall prohibit any person or persons, whether singly or in concert, from terminating any relation of employment, or from ceasing to perform any work or labor, or from recommending, advising, or persuading others by peaceful means so to do; or from attending at any place where any such person or persons may lawfully be, for the purpose of peacefully obtaining or communicating information, or from

peacefully persuading any person to work or to abstain from working; or from ceasing to patronize or to employ any party to such dispute, or from recommending, advising, or persuading others by peaceful and lawful means so to do; or from paying or giving to, or withholding from, any person engaged in such dispute, any strike benefits or other moneys or things of value; or from peaceably assembling in a lawful manner, and for lawful purposes; or from doing any act or thing which might lawfully be done in the absence of such dispute by any party thereto; nor shall any of the acts specified in this paragraph be considered or held to be violations of any law of the United States." Comp. St. 1916, § 1243d.

In the above case, Judge Killits, after quoting the above section 20, says:

"It is well to note, and not to lose sight of, the fact that the words 'lawfully,' 'peacefully,' 'lawful,' 'peaceful,' dominate the thought of the second paragraph of the section in question; they control its meaning, as they control both the court and the parties to a labor controversy. The statute but enacts the position which courts have universally taken; there is nothing new in it, for we hold that no case exists where a court has attempted jurisdiction to control lawful and peaceable action by injunction, although it may seem that sometimes judgment may have been faulty as to what particular action was 'unlawful' or provocative of a disturbed peace."

And further this test:

"What constitutes peaceful picketing may be answered by any fair-minded man, if this question is asked, 'Would this be lawful if no strike existed?'"

. Whatever may have been the reasoning and final determination of the many cases which have been cited by learned counsel for the complainant in a carefully prepared and exhaustive brief on this subject, I am of the opinion that we must now confine our search for light on this subject to the provisions of the Clayton Act, since the provisions of this act are in force and effect and are constitutional.

Under section 20 of the Clayton Act, I cannot grant a restraining order or injunction to the complainant, unless it be necessary to prevent irreparable injury to property or to a property right of the complainant, and for which injury there is no adequate remedy at law. No such restraining order or injunction is permitted which shall prohibit any person or persons from terminating the relation of employment, or from ceasing to perform work or labor, or recommending, advising, or persuading others by peaceful and lawful means so to do, or from paying or giving to, or withholding from, any person engaged in such dispute any strike benefits or other moneys or things of value, or from peacefully assembling in a lawful manner, and for lawful purposes, or from doing any act or thing which might lawfully be done in the absence of such dispute by any party thereto.

Upon the trial the defendants offered no proof. The case, therefore, rests upon the testimony offered by the complainant. The defendants take the position that their object was a lawful one, to wit, to secure for the mechanics of this union an eight-hour day at a minimum scale of wages.

It appears that at the complainant's plant in Battle Creek, Mich., some union machinists were employed, as well as nonunion men. In other words, the complainant was running an "open shop." Deering and Neyland, representing the defendants, approached Mr. Stone,

chairman of the board of directors of the complainant, and in very friendly attitude and man-fashion urged him, at several interviews, to accede to the desires of the union, namely, to establish an eight-hour day at a minimum scale of wages. Mr. Stone describes these meetings as friendly. No threats were made use of; but Mr. Stone, for reasons sufficient for himself, refused to accede to their wishes. I can find nothing in the testimony of Mr. Stone which would indicate any unlawful acts, or, indeed, any ungentlemanly acts, that might be complained of so far as the means employed by the defendants in trying to persuade him were concerned. Some reports and minutes of meetings of the union at which there was a discussion as to the complainant's strike (in August, 1913) and attitude on the eight-hour day were published in labor magazines and were offered in evidence. The happenings at these meetings seem to indicate that the International Association of Machinists was endeavoring to improve the condition of its members, both in respect to the hours of labor and of wages paid, and disclosed that a general plan for this purpose was under discussion.

The complainant called its employés, Messrs. Young, Burke, Dowe, and Squier, all of whom had something to do with the erection of the presses which were manufactured, sold, and erected by the complainant. On several occasions during the progress of this work, Deering called upon these men and engaged them in conversation, seeking to persuade them not to work, and to stand with the union; but I can find no threats, or ill-advised language, or offensive or degrading speech, which would in any way provoke a breach of the peace in resentment. There is some statement made by Mr. Young that Deering stated to him that he had reason "to be afraid if he only knew it," and that if he did not cease working his union card would be taken away; but. under the by-laws of the union of which he was a member, the union had the right to take away a card of membership where a member was found working with nonunion employés where a strike was in progress. There is evidence that Young was assaulted while going from his work. However, there is no evidence which connects Deering or the other defendants with this assault. If the assault was committed by one of the defendants, it would be a crime, and I cannot, without proof thereof, reach the conclusion by other than competent evidence of the defendants' connection with the commission thereof.

Britton, a cartman, testified that, while making deliveries of the presses in New York, his men handling the machinery were requested by Mr. Deering to stop work, which they did; but the men employed were members of the Machinists' Helpers' Union. This withdrawing of workmen was obtained though peaceful persuasion. There is no authority which holds that peaceful persuasion, resulting in employés withdrawing their services, is unlawful.

Mr. Cosgrove, connected with the New York Law Journal, and Mr. Zuecca, of the Italian Herald, were informed by Deering that nonunion men were engaged in installing the presses, and that, since each employed union pressmen, they would have considerable trouble. It does not appear that any trouble resulted from this conversation, nor that any injury resulted to either of the gentlemen. I can see nothing wrong in this conduct.

Harry A. Cochrane, who was in charge of an exhibition of the American Newspapers Publishers' Association at the Grand Central Palace, was approached by Deering, asked if he was going to employ union labor, and said that he was. Deering then informed him that, if nonunion machinists were employed in any part of the exposition, the union machinists would withdraw their services; he told him of the strike at the Duplex plant at Battle Creek, and that nonunion machinists would not handle their product in New York. Cochrane tried to persuade Deering otherwise. There was no violence of any kind. Cochrane insisted upon his right to employ nonunion men as well as union men. I can find nothing in this conduct which is objectionable.

Indeed, a careful reading of the entire record leads to the conclusion that, if men have a right to strike and to endeavor to prevail upon others to fail to work for the employer, this is such a case as exemplifies careful, prudent, and lawful conduct on the part of the employés. There is nothing in this record which warrants my granting the injunction sought. Testing the record here by the rule that prevailed in this circuit prior to the Clayton Act, the complainant cannot succeed. In Gill Engraving Co. v. Doerr (C. C.) 214 Fed. 111, Judge Hough said:

"I do not perceive any distinction upon which a legal difference of treatment should be based between a lockout, a strike, and a boycott. They often look very unlike, but this litigation illustrates their basic identity. All are voluntary abstentions from acts which normal persons usually perform for mutual benefit; in all the reason for said abstention is a determination to conquer and attain desire by proving that the endurance of the attack will outlast the resistance of the defense; and for all the law of New York provides the same test, namely, to inquire into the legality (1) of the object in view and (2) of the means of attainment."

In National Fireproofing Co. v. Masons Builders' Association, 169 Fed. 263, 94 C. C. A. 535, 26 L. R. A. (N. S.) 148, it was held:

"Laborers * * * may combine for mutual advantage, and, so long as the motive is not malicious, the object not unlawful nor oppressive, and the means neither deceitful nor fraudulent, the result is not a conspiracy, although it may necessarily work injury to others."

A peaceful and orderly strike, not to harm others, but to improve conditions, has never been held to be a violation of the law. The object here to establish an eight-hour day with a minimum scale of wages in this particular industry was a lawful purpose, and, unless something was done in violation of the law, the complainant cannot be heard to complain. The language of Judge Hough in the Gill Engraving Co. v. Doerr Case, supra, is appropriate here:

"What motive incited defendants to injure Gill Company? None, except that it hinders the expansion and aggrandizement of the union, and therefore gives rise to the same kind of objection that the soldier has to the man who prevents his onward march. It can rarely be said that the soldier is moved by a desire to kill his opponent, but he will kill him if necessary. * * * In the United States courts for this circuit, National Fireproofing Co. v. Mason Builders Ass'n, 169 Fed. 259, 94 C. C. A. 535, 26 L. R. A. (N. S.) 148, is controlling. It accepts the New York cases fully, piously regrets the injuries committed, and writes the epitaph of litigation such as this by declaring that, when equal legal rights clash, equity is helpless. This is true; it would have been just as true to point out that the result of legalizing strikes, lockouts, and boycotts under any circumstances must be that those who understand the use of such legal tools can always keep within the law and

accomplish their main purpose while inflicting all necessary 'incidental' injury."

In Iron Molders' Union, No. 125, Milwaukee, v. Allis-Chalmers Co., 166 Fed. 45, 91 C. C. A. 631, 20 L. R. A. (N. S.) 315, this rule was laid down:

> "The right to persuade new men to quit or decline employment is of little worth, unless the strikers may ascertain who are the men that their late employer has persuaded or is attempting to persuade to accept employment. Under the name of persuasion, duress may be used; but it is duress, not persuasion, that should be restrained and punished. In the guise of picketing, strikers may obstruct and annoy the new men, and by insult and menacing attitude intimidate them as effectually as by physical assault. But from the evidence it can always be determined whether the efforts of the pickets are limited to getting into communication with the new men for the purpose of presenting arguments and appeals to their free judgments. Prohibitions of persuasion and picketing, as such, should not be included in the decree."

From the above quotations, it is apparent that the right to strike for higher wages and to improve conditions of labor have been firmly established and recognized by the federal courts. The object of this strike, as stated before, was a lawful one, and an examination of this record indicates that it was carried on for no deliberate purpose to interfere with complainant's conduct of its business, nor to injure or destroy its business or property. The purpose being lawful, if lawful means are used to effectuate it, such means cannot be made to reach back and taint the purpose itself with unlawfulness, and thus render unlawful all the acts in its furtherance. In pursuit of a lawful purpose to secure a raise in wages, picketing may be employed to ascertain whom the late employer has persuaded, or attempted to persuade, to accept employment, and persuasion may be used to induce them to refuse or quit the employment. Tri-City Cent. T. Council v. American Steel Foundries, 236 Fed. 732, 151 C. C. A. 578.

Even though picketing and persuasion might interfere with the complainant's conduct of its business, and make it harder to retain old employés and to hire and keep new ones, it would not warrant the granting of an injunction. As was said in Tri-City Cent. T. Council v. American Steel Foundries, supra:

> "Indeed, the very act of striking often seriously interferes with that 'free and unrestrained control and operation of the employer's business' which the plaintiff here alleges as an object of the conspiracy charged; but the lawfulness or unlawfulness of the strike is not to be tested by such incidental effect of it. And so it is with persuasion and picketing, properly carried on in the interest of a lawful strike. The laborer may be strictly within his rights, although he obstructs 'the free and unrestrained control and operation of the employer's business.' The right to strike must carry with it by implication the right to interfere with the employer's business to a certain extent. The right to persuade prospective employés by legitimate argument must of necessity interfere with the employer's business. Where labor is essential to the successful conduct of a business, any interference with that labor is an interference with the employer's business. But whether the interference with the business is lawful or unlawful depends upon the facts in each case."

Applying the foregoing principles to the evidence in the case at bar forbids the granting of a decree to the complainant, and accordingly a decree must be entered herein, dismissing the bill, with costs.