Argued May 23; reargued September 24, 1940; affirmed
January 28, 1941

# SCHWAB *v.* MOVING PICTURE MACHINE OPERATORS LOCAL NO. 159 OF THE INTERNATIONAL ALLIANCE OF THEATRICAL STAGE EMPLOYES AND MOVING PICTURE MACHINE OPERATORS OF THE UNITED STATES AND CANADA ET AL.

(109 P. (2d) 600)

*K. C. Tanner*, of Portland, for appellants.

*Will H. Masters*, of Portland (Roscoe P. Hurst, of Portland, on the brief), for respondent.

LUSK, J. The plaintiff, E. L. Schwab, is the owner and operator of a moving picture theatre in the city of Portland known as the Third Avenue Theatre. He brought this suit for the purpose of obtaining a decree enjoining the defendants, Moving Picture Machine Operators Local No. 159 of the International Alliance of Theatrical Stage Employes and Moving Picture Machine Operators of the United States and Canada,

a voluntary association, and its officers, and Central Labor Council of Multnomah County, state of Oregon, a voluntary association, and its officers, from picketing his place of business. From a decree granting an injunction the defendants have appealed.

The picketing began August 3, 1938. It consisted of patrolling on the sidewalk in front of the theatre by men who wore placards bearing the legend: "This theatre unfair to organized labor. Central Labor Council." How many pickets were used does not appear, but there is no claim of violence, threats or intimidation. Plaintiff concedes that it was peaceful picketing. He charges, however, that the legend on the placards was false, both because there was no labor dispute and because he was not unfair to his employes. Defendants admit that their activities have caused damage to the plaintiff's business.

Plaintiff has six employes, three of whom are moving picture operators. The operators are the only employes affected by this controversy. They are not members of the defendant Local No. 159 (hereinafter referred to as the union), but are willing to become members if the union will admit them. So far as appears, they are satisfied with their wages, hours and conditions of employment. Their wages conform to the union scale, as do their hours of work, except in one particular, which will be explained later. From our examination of the record, we are satisfied that the chief purpose of the picketing was to coerce the plaintiff into discharging his operators and hiring members of the union in their place. The defendants assert that, even if this were true, there is, nevertheless, a labor dispute, and the court was without jurisdiction to issue an injunction. They concede that one purpose of the

picketing was to compel the plaintiff to unionize his shop, but deny that they were insisting upon the plaintiff discharging his employes.

Upon this, the only substantial issue of fact in the case, we shall give briefly the reasons which, in our opinion, support the conclusion which we have reached.

■ In 1935 or 1936, one Moore, then business agent for the union, asked Schwab to talk to his employes about joining the union, and informed him that the membership fee was $200. When Schwab told Moore that this was excessive, the latter said that the members of the union were entitled to the jobs.

■ There is no evidence of any effort on the part of the union or its representatives to induce Schwab's employes to join the union in the year 1938, when Porter, who had succeeded Moore as business agent for the union, was negotiating with Schwab.

■ In February 1938, Porter tendered Schwab a form of contract with the request that he sign it. This would have required Schwab to conform to union standards as to wages, hours of work, etc., and to employ as operators only members of the union. Schwab had no objection to signing the contract, provided his employes were taken into the union, but Porter insisted that Schwab discharge one employe who would be replaced by a member of the union, but was willing that another employe might work on a "permit" from the union. Porter denied this, but the issue must be resolved against the defendants, because the form of contract contains a clause reading: "Mr. ——— shall be permitted to work thirty-six hours a week by a permit." This clause is in different typing from the remainder of the instrument, which appears to be a

standard form used by the union, and was evidently inserted to meet partially Schwab's objection to discharging his operators.

■ The union, as Porter testified, had enough members to supply the demand for moving picture operators in Portland. Membership in the union is only granted after the applicant has obtained the endorsement of three members, has been approved by the international office, has passed an examination as to his ability, and has received a favorable vote of the members. With only enough jobs to go around, the motive of self-interest, when considered in connection with the other circumstances in evidence, makes it highly improbable that the union would have added to its numbers and thereby increased competition for the jobs.

■ There was testimony that operators, apparently fully qualified for membership in the union, had been rejected arbitrarily; and that the operators in another theatre in Portland lost their jobs when the theatre was unionized. There is no evidence that the plaintiff's operators ever applied for admission into the union, but it is clear that it would have been futile for them to have done so. Neither is there any evidence that they were not fully qualified for membership, under the union rules.

At the time that Porter first approached Schwab on the subject of signing a union contract, Schwab was paying his employes less than union wages. Schwab consulted his attorney about the matter, and, after receiving his attorney's advice, notified Porter that he would not sign the contract. In March 1938, all of Schwab's employes organized themselves into a union and appointed as their exclusive bargaining agent

an attorney, who drew their constitution and by-laws for them. The attorney notified Schwab of this action.

When the picketing commenced in August 1938, Schwab was paying his operators union wages, though Porter was not advised of this fact. He was also conforming to the union requirement of six hours a day six days a week, with the exception that it was the practice for the operator working the day shift to report in the morning before the opening of the theatre, which was at noon, and devote an hour and a half to two hours to supervising the janitor work, in addition to the time spent in the operating room. The men arranged matters, however, so that each operator had a full day off each week.

The question for decision is whether, in these circumstances, a labor dispute existed within the meaning of that term as defined in chapter 355, Oregon Laws 1933, § 102-925, O. C. L. A. If so, the court was without jurisdiction to issue an injunction, since the statute has deprived the courts of this state of jurisdiction in any case involving or growing out of a labor dispute, to enjoin persons participating or interested in such labor dispute, *inter alia*, from ''giving publicity to the existence of, or facts involved in, any labor dispute, whether by advertising, speaking, patrolling or by any other method not involving fraud or violence and/or intimidation.'' § 4, subd. 5, Ch. 355. See, *Starr v. Laundry & Dry Cleaning Workers Local Union No.* 101, 155 Or. 634, 63 P. (2d) 1104.

The definition of a labor dispute in the statute is as follows:

''The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons

in negotiating, fixing, maintaining, changing or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employe." § 13, subd. 3, Ch. 355.

In *Geo. B. Wallace Co. v. International Association of Mechanics Local 1005*, 155 Or. 652, 63 P. (2d) 1090 (separate cases of three employers which were consolidated), the question in one of the cases was whether the statute was applicable where a union had called a strike of union automobile mechanics in the city of Portland, and it appeared that in the particular plant none of the employes were members of the union and all were satisfied with their wages, hours and conditions of employment, although the pay and the hours of work did not conform to the standards prescribed by the union. In view of the final phrase of § 13, subd. 3, "regardless of whether or not the disputants stand in the proximate relation of employer and employe", and the decisions of the federal courts construing the Norris-LaGuardia Act, 29 U. S. C. A., §§ 101–115, upon which our statute is modeled, and of state courts construing enactments of like character, the court held that there was a labor dispute notwithstanding that no employe of the particular employer was a member of the union and notwithstanding that all the employes were satisfied, and a decree enjoining picketing was reversed. This was not the law of this state prior to the 1933 enactment, *Moreland Theatres Corporation v. Portland Moving Picture Machine Operators' Protective Union Local 159*, 140 Or. 35, 12 P. (2d) 333, although there is a dictum supporting the decision in the Wallace case in *Blumauer v. Portland Moving Picture Machine Operators' Protective Union Local 159*, 141

Or. 399, 17 P. (2d) 1115. In the Moreland Theatres case, decided in 1932, the court considered the injunction statute then in effect, and, following the construction placed upon its prototype, the Clayton Act, 29 U. S. C. A., § 52, by the United States Supreme Court in *Duplex Printing Press Company v. Deering*, 254 U. S. 443, 41 S. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196; Id., 247 Fed. 192, held that that statute was not intended to prohibit the issuance of injunctions when the relation of employer and employe did not exist between the contending parties. It was the decision in the Duplex Printing Company case restricting, as many thought erroneously, the scope of the Clayton Act, that led to the passage of the Norris-LaGuardia Act, as is more fully shown in *Wallace v. International Association*, supra.

Since then, the Supreme Court of the United States, in construing and applying the Norris-LaGuardia Act, has held that the federal courts are without jurisdiction to enjoin peaceful picketing, where the demand of the union is that an employer unionize his shop, the employer being willing, but his employes refusing to join the union, *Lauf v. E. G. Shinner Co.*, 303 U. S. 323, 58 S. Ct. 578, 82 L. Ed. 872; in a case where an association of negroes, not a labor union, was attempting to coerce the owner of a store into hiring negro employes, *New Negro Alliance v. Sanitary Grocery Co.*, 303 U. S. 552, 58 S. Ct. 703, 82 L. Ed. 1012; and in a jurisdictional dispute between two unions, *Fur Workers' Union Local No. 21238 v. Fur Workers' Union No. 72*, 308 U. S. 522, 60 S. Ct. 292, 84 L. Ed. 443. In that case the court sustained the right of one union to picket the place of business of an employer which had properly recognized and entered into a contract with another

union pursuant to the provisions of the National Labor Relations Act. The National Labor Relations Board, however, had not certified the bargaining unit. A different result was reached in *Oberman & Co., Inc., v. United Garment Workers,* 21 F. Supp. 20, because the National Labor Relations Board had certified the bargaining unit. After that, it was held, a dispute could no longer exist. See, to the same effect, *Bloedel Donovan Lumber Mills v. International Woodworkers of America, Local No. 46,* 4 Wash. (2d) 62, 102 P. (2d) 270.

The latest decision of the Supreme Court on this subject was rendered November 18, 1940, in *Milk Wagon Drivers' Union v. Lake Valley Farm Products, Inc.,* 311 U. S. 91, 61 S. Ct. 122, 85 L. Ed. —. That was a suit by a C. I. O. union, two dairies, and a cooperative association which supplied milk to the dairies, to restrain picketing by an A. F. of L. union of milk wagon drivers. The purpose of the picketing was to compel the C. I. O. union to abandon its so-called "vendor" system, under which the members of the union bought milk from the dairies and resold it and delivered it to retail customers, and to compel the members of the C. I. O. union to join the A. F. of L. union. The plaintiff union sold below the standard prices charged for the milk supplied by dairies employing A. F. of L. drivers. The defendant union claimed that the reason the price could be cut was that the vendors worked long hours, under unfavorable working conditions, without vacations, and with very low earnings. The court held this to be a labor dispute, and plaintiffs therefore were not entitled to an injunction. The objection that defendants' attempt to unionize the vendors was upon the condition

that they would cease to handle milk as vendors if admitted to membership in the union was answered with the statement:

"There are few instances of attempted unionization in which a change to union membership would not require some alteration in the conditions or terms of employment."

*Cinderella Theatre Co. v. Sign Writers' Local Union,* 6 F. Supp. 164, and *United Chain Theatres v. Philadelphia Moving Picture Machine Operators' Union,* 50 Fed. (2d) 189, both sustain the right of unions to picket for a closed shop.

In the state courts the interpretations of statutes similar to the Norris-LaGuardia Act have not been uniform. The Washington and Indiana courts have declined to follow the lead of the federal courts and hold that picketing for unionization, where the employes are none of them members of the union and are not complaining, may be enjoined: *Safeway Stores. Inc., v. Retail Clerks' Union,* 184 Wash. 322, 51 P. (2d) 372; *Fornili v. Auto Mechanics' Union,* 200 Wash. 283, 93 P. (2d) 422; *Shively v. Garage Employees' Local Union,* 6 Wash. (2d) 560, 108 P. (2d) 354; *Roth v. Local Union,* 216 Ind. 363, 24 N. E. (2d) 280. Under anti-injunction statutes less broad than ours, decisions to the like effect have been rendered in *Simon v. Schwachman,* 301 Mass. 513, 18 N. E. (2d) 1; *Crosby v. Rath,* 136 Ohio St. 352, 25 N. E. (2d) 934; *Meadowmoor Dairies v. Milk Wagon Drivers' Union,* 371 Ill. 377, 21 N. E. (2d) 308, writ of certiorari granted, 301 U. S. 655, 60 S. St. 1092, 84 L. ed. 1419 (a case growing out of the same controversy as in *Milk Wagon Drivers' Union v. Lake Valley Farm Products, Inc.,* supra). The Massachusetts court pointed out in *Simon v. Schwach-*

*man,* supra, that the statute of that state, in defining the term "labor dispute", omitted the phrase "regardless of whether the disputants stand in the relation of employer and employe".

The courts of Wisconsin, New York and Colorado are in accord with the federal decisions. In *Senn v. Tile Layers' Protective Union,* 222 Wis. 383, 268 N. W. 270, 872, the Wisconsin statute was held to preclude injunctive relief against picketing to compel a small contractor to unionize his shop, even though compliance with the union demands meant that Senn, who was accustomed to work with his own hands with the tools of the trade, must abandon the practice, since, as a contractor, he was not eligible to union membership. The Supreme Court of the United States, reviewing the judgment, held that the statute as thus applied did not contravene the Fourteenth Amendment: *Senn v. Tile Layers' Protective Union,* 301 U. S. 468, 57 S. Ct. 857, 81 L. ed. 1229. Picketing to compel unionization of a plant in which all the employes had voted not to join the union was sustained in *American Furniture Co. v. I. B. of T. C. & H.,* 222 Wis. 338, 268 N. W. 250, 106 A. L. R. 335. In *Goldfinger v. Feintuch,* 276 N. Y. 281, 11 N. E. (2d) 910, 116 A. L. R. 477, the union picketed retail stores which sold the products of a manufacturer who employed non-union help and paid less than the union wage scale. An injunction was denied. To the same effect is *Boro Park Market v. Heller,* 280 N. Y. 481, 21 N. E. (2d) 687. Before the enactment in New York of its anti-injunction statute, a similar result was reached in *Exchange Bakery and Restaurant, Inc., v. Rifkin,* 245 N. Y. 260, 157 N. E. 130. The Colorado court recently held in *Denver Local Union No. 13 v. Perry Truck Lines,* Colo. Sup., 101 P. (2d) 436, that

picketing to compel an employer to unionize its shop would not be enjoined.

In addition to these decisions under statutes like ours, attention is called to the five late decisions of the Supreme Court of California: *McKay v. Retail Automobile Salesmen's Local Union No. 1067*, Cal. Sup., 106 P. (2d) 373; *Shafer v. Registered Pharmacists Union Local 1172*, Cal. Sup., 106 P. (2d) 403; *Lund v. Auto Mechanics' Union No. 1414*, Cal. Sup., 106 P. (2d) 408; *Fortenbury v. Superior Court in and for Los Angeles*, Cal. Sup., 106 P. (2d) 411; and *C. S. Smith Metropolitan Market Co. v. Lyons*, Cal. Sup., 106 P. (2d) 414. These cases all involved picketing for a closed shop. In all except the Shafer and Fortenbury cases the employes were satisfied with their jobs; in fact, in the McKay case, it was the employes who instituted suit to enjoin the picketing. In California, there is no statutory definition of a labor dispute and the legislature had refused to enact a law patterned after the Norris-LaGuardia Act. See, dissenting opinion of Curtis, J., 106 P. (2d) 391. In all these cases the court held in four to three decisions that the picketing was justified and would not be enjoined. The basis of the decisions may be found in the statement in the McKay case, that "the principle or rationale involved is that a court should not use its coercive implements to aid one party in an economic struggle in which the other party has a substantial interest at stake and is employing means which are not in themselves unlawful." The dissenting opinion of Curtis, J., in the McKay case concedes that a dispute between an employer and an outside union over the unionization of his shop comes within the definition of a labor dispute in the Norris-LaGuardia Act.

In the foregoing review there has been no attempt to cite all, or any more than a small number, of the numerous decided cases, or even of those which we have examined, but only those which are deemed important for our immediate purpose, namely, the proper construction of the statute by which we must be governed. The prevailing and dissenting opinions in the McKay case contain full lists of the decisions sustaining and those denying the right to picket for unionization, in the absence of a statute similar to the Norris-LaGuardia Act. The cases on this and other phases of the law relating to picketing are collated in the annotations in 127 A. L. R. 869, 124 A. L. R. 751, 120 A. L. R. 316, 106 A. L. R. 361, 97 A. L. R. 1334.

It will have been observed that, with certain apparent or real exceptions presently to be noted, none of the cases hereinabove cited parallel the instant case in their facts. In those that did not involve controversies between competing unions the activities of the unions were aimed merely at unionization of the employer's plant. The union's demands would be satisfied if the employer entered into a closed shop contract, retaining his employes who were willing to become members of the union. There was no effort to compel an employer to discharge his employes in order that members of the union might succeed to their places. The objective was a closed shop—not a closed union. And the unions, in their endeavor to strengthen their bargaining power and bring it to a plane of equality with that of the employers by making their "combination extend beyond one shop" (Chief Justice Taft in *American Steel Foundries v. Tri-City Central Trades Council*, 257 U. S. 184, 42 S. Ct. 72, 66 L. ed. 189, 27 A. L. R. 360), were not doing so at the expense of

other workers to whom the benefits of unionism were arbitrarily denied. In sum, the unions were not wielding the economic weapons which the law has placed in their hands in order to create and perpetuate a monopoly of the jobs available in the community to workers in the craft.

To these observations the Cinderella Theatre Company case offers an apparent exception. While not explicit on the subject, the statement in the opinion that the employers were requested by the union "to discharge from their employ their one sign writer, a certain George Campbell, who was not and is not a member of any labor union and to employ in his place a union sign writer" indicates that the case may be not essentially different from the one at bar. The particular phase of the matter now under consideration was not, however, discussed in the court's opinion.

The United Chain Theatres case might also, at first with which we are dealing, but it is, in reality, clearly distinguishable because, before the picketing commenced, the theatre owners had taken a definite position against bargaining with the union under any circumstances.

The decision of the United States Supreme Court in the New Negro Alliance case is an extremely broad interpretation of the Norris-LaGuardia Act, and, but for the authority of the highest court of the land in construing a federal statute, most lawyers, we believe, would cling to the conviction expressed by the United States Court of Appeals for the District of Columbia, when passing upon the same case below, that the controversy there was not a labor dispute but a racial dispute, 92 Fed. (2d) 510, 512. However that may be,

the case on its facts presents an important point of divergence from that before us, since the demand of the Alliance was not that the employer discharge its white employes in order to make way for negroes, but only that it "adopt a policy of employing negro clerks in certain of its stores in the course of personnel changes." And it should be noted that the Supreme Court dwelt at some length upon the grievance of the Alliance, saying:

"Race discrimination by an employer may reasonably be deemed more unfair and less excusable than discrimination against workers on the ground of union affiliation."

We are not advised what the Supreme Court would say if the converse situation were presented to it, as in *Willis v. Local No. 106*, 26 Ohio N. P. (N. S.) 435. There a union, which denied admission to negroes because of their race, picketed a restaurant for the purpose of compelling the proprietor to discharge his negro waiters. They wanted to affiliate with the union, and the employer wanted them to. The union wanted the jobs for its members. An Ohio Common Pleas court issued a temporary restraining order.

The Senn case nearly approaches this one, because if Senn had complied with the union's demand, his occupation, like Othello's, would be gone. The union, however, justified its position that a contractor must personally refrain from working with the tools of his trade by pointing out "that the membership in the union has decreased during the depression years and that, as a necessary requisite for a proper existence and livelihood, these craftsmen find it necessary to require employers to comply with the terms of Article III." The court, therefore, concluded that Senn's

"method of conducting his business brings into the situation a direct attack by him upon the means relied upon by the union to protect its scale of wages, hours and working conditions against the cutting of prices and lengthening of hours of work." And the Supreme Court of the United States, in passing upon Senn's claim that the statute, as construed by the Wisconsin court, violated the due process clause of the Fourteenth Amendment, referred to the fact that the state court had found reasonable the union rule which barred contractors from membership, that the union's request was not malicious, and there was no desire to injure Senn.

In 1928, Mr. Justice Frankfurter, not then a member of the Supreme Court, writing on the subject of "Injunction in American Labor Controversies", said: "The damage inflicted by combative measures of a union—the strike, the boycott, the picket—must win immunity by its purpose.": 44 Law Quarterly Review 164, 182. Mr. Justice Frankfurter's hostility to the unrestrained use of injunctions in labor controversies is too well known to need elaboration, and his position as an authority on the law relating to labor unions is universally acknowledged. His quoted statement comes to the same thing as that made by this court in the Wallace case and reiterated in *A. F. of L. v. Bain*, p. 183 supra, 106 P. (2d) 544, 130 A. L. R. 1278; "Picketing must be peacefully carried on and it must be for a lawful purpose". Mr. Justice Holmes, as a member of the Supreme Judicial Court of Massachusetts, gave expression to the same idea when he wrote in his dissenting opinion in *Vegelahn v. Guntner*, 167 Mass. 92, 106, 44 N. E. 1077, 57 Am. St. Rep. 443, 35 L. R. A. 722: "In numberless instances the law warrants the

intentional infliction of temporal damages because it regards it as justified." See, to the same effect, Holmes, C. J., dissenting, in *Plant v. Woods*, 176 Mass. 492, 504, 57 N. E. 1011, 79 Am. St. Rep. 330, 51 L. R. A. 339; *Aikens v. Wisconsin*, 195 U. S. 194, 25 S. Ct. 3, 49 L. ed. 154; 1 Teller, "Labor Disputes and Collective Bargaining", pp. 334 et seq., §§ 113, 114; 430, § 136; 4 Restatement of the Law of Torts 97, § 775. In the Aikens case the court, speaking through Mr. Justice Holmes, said:

"It has been considered that, prima facie, the intentional infliction of temporal damages is a cause of action, which, as a matter of substantive law, whatever may be the form of pleading, requires a justification if the defendant is to escape."

■ That the law on picketing, as laid down in these authorities and in many others which might be cited, has been substantially modified by the statute is, of course, not open to question. Whether our statute be regarded as a change in the substantive law, as is that of Wisconsin (*American Furniture Co. v. I. B. of T. C. & H.*, supra), or a mere withdrawal by the legislature of jurisdiction conferred by the legislature upon the courts, as in the case of the Norris-LaGuardia Act, need not now be considered; in either event, there can be no doubt that, so far as the injunctive process is concerned, the damage incident to peaceful picketing, or, as the statute puts it, "giving publicity to the existence of, or facts involved in, any labor dispute, whether by advertising, speaking, patrolling or by any other method not involving fraud or violence and/or intimidation" must now be considered justified in many instances where the courts have previously been free to determine whether legal justification existed.

■ It does not, however, follow that in construing the statute for the purpose of determining whether a labor dispute, as defined in § 13, exists, the court is precluded from looking at the end sought to be accomplished by the picketing. As in other cases, it is the court's province and duty to be governed, not by the letter, but by the spirit of the law: *Church of The Holy Trinity v. United States*, 143 U. S. 457, 460 12 S. Ct. 511, 36 L. ed. 226. The court in that case, speaking through Mr. Justice Brewer, said: "It is a familiar rule that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers;" and, as illustrating the application of the rule, the court quoted from *United States v. Kirby*, 74 U. S. 482, 7 Wall. 482, 486, as follows:

"The common sense of man approves the judgment mentioned by Puffendorf, that the Bolognian law which enacted 'that whoever drew blood in the streets should be punished with the utmost severity,' did not extend to the surgeon who opened the vein of a person that fell down in the street in a fit. The same common sense accepts the ruling, cited by Plowden, that the statute of 1st Edward II, which enacts that a prisoner who breaks prison shall be guilty of felony, does not extend to a prisoner who breaks out when the prison is on fire, 'for he is not to be hanged because he would not stay to be burnt.' "

We have already called attention to the fact that the Supreme Court of the United States in the New Negro Alliance case, in the course of determining that the controversy there was a labor dispute, spoke of the wrong of racial discrimination, and that the Supreme Court of Wisconsin, in the Senn case, seemed to find it necessary to pass upon the reasonableness of the

union rule excluding contractors who work with the tools of the trade from membership. In the most recent decision of the Supreme Court on the subject, the case of Milk Wagon Drivers Union, *supra,* the court recited at some length the facts of the controversy and the injuries of which the picketing union had the reasonable right to complain, arising out of the practices of the rival union. And in the Wallace case, this court, in arriving at the conclusion that the controversy fell within the terms of the statute, notwithstanding that no members of the picketing union were employes of the employer involved, did not base its decision on the bare language of the statute but pointed to its history, and discovered in the ends sought to be achieved by the union a purpose consonant with the spirit of the law and the intention of the legislature, as so construed.

Furthermore, the statute itself has furnished a guide for its interpretation. By § 2 it is provided: * * *

"In the interpretation of this act, and in determining the jurisdiction and authority of the courts of this state, as such jurisdiction and authority herein are defined and limited, the public policy of the state of Oregon hereby is declared as follows:

"Whereas under prevailing economic conditions, developed with the aid of governmental authority for owners of property to organize in a corporate and other forms of ownership association, the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor and thereby to obtain acceptable terms and conditions of employment, wherefore, though he would be free to decline to associate with his fellows, it is necessary that he have full freedom of association, self-organization and designation of representatives of his own choosing to negotiate the terms and conditions of his employment and that he shall be free from

the interference, restraint or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection; therefore, the following definitions of and limitations upon the jurisdiction and authority of the courts of this state hereby are enacted.''

We recur to the definition of a labor dispute in § 13:

''The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employe.''

■ Literally read, without reference to the purposes intended to be accomplished by the law and the rule of interpretation laid down in § 2, we suppose that it may be plausibly contended that this is a case involving or growing out of a labor dispute—that the controversy concerns terms or conditions of employment or the association or representation of persons seeking to arrange terms or conditions of employment. But such a conclusion, in our opinion, would be altogether out of harmony with the spirit of the law and the intention of the legislature. The restraint imposed upon courts in the use of the injunctive process was intended to aid working men in their efforts to reach a plane of bargaining equality with employers by making their ''combination extend beyond one shop'', and so to raise the standard of wages and improve the working conditions throughout an entire industry. It was not intended to leave unions free by the use of these economic weapons to inflict wanton injury upon fellow-

workers and to accomplish the selfish and unAmerican purpose of building a monopoly of labor.

■ As stated in 19 R. C. L. 10, § 4, monopolies and combinations in restraint of trade "are generally denounced as odious, intolerable, and contrary to public policy and common right. They are regarded as repugnant to the spirit of our government and institutions, and are frequently forbidden by constitutional as well as statutory enactment. Indeed, as the term is generally employed, injury to the public is implied from its use. Monopoly is said to be destructive of individual rights, and of that free competition which is the life of business, and it revives and perpetuates one of the great evils which it was the object of the framers of our form of government to eradicate and prevent. It is alike destructive to both individual enterprise and individual prosperity, whether conferred on corporations or individuals, and therefore public policy is, and ought to be, as well as public sentiment, against it."

For these reasons the court in *Cameron v. International Alliance, Inc.*, 118 N. J. Eq. 11, 176 Atl. 692, 97 A. L. R. 594, declared void as against public policy a contract between a local union of moving picture operators and another organization known as a junior local, the effect of which was to give a monopoly of the labor market in the particular trade to the local union and to deprive members of the junior local of an equal opportunity to obtain employment and earn a livelihood. A like result was reached in the case of *Wilson v. Newspaper and Mail Deliverers' Union*, 123 N. J. Eq. 347, 197 Atl. 720, where, at the suit of an employe, a contract between an employer and a labor union for a closed shop was held contrary to public policy, it

appearing that in conjunction with similar policies adopted by other employers a substantial monopoly of labor had resulted. Cf. *Dorrington v. Manning*, 135 Pa. Superior Ct. 194, 4 Atl. (2d) 886; *Willis v. Local No. 106*, supra. In 1 Teller, *ibid.*, 430, § 136, the author, in his discussion of the right of free speech in relation to picketing, says:

"It is not improper to advocate the social desirability of monopoly, or combinations in restraint of trade and commerce. But it is quite another thing and clearly illegal to combine in restraint of trade, or tortiously to coerce a monoply."

§ 788, p. 128, 4 Restatement of the Law of Torts, approves concerted action by employes for a closed shop. In the comment upon that section, it is said, at p. 130:

"When a demand for restriction (i. e., of employment to members of a union) does not involve either securing of work for union employes or the maintenance or increase of union membership, subject to reasonable regulation by the union, but is directed toward the establishment of a monopoly privilege in a group of present members of the union to the exclusion of everyone else, it is not a demand within the rule stated in this Section, whether or not it is otherwise proper."

Referring to the foregoing statement and to the New Jersey court's decision in the Wilson case, the author says in 1 Teller, *ibid.*, 285, § 99:

"Labor unions are no holier than the workers who compose them, nor are non-union workers outcasts of the industrial life except, in a realistic sense, to the extent that the industrial economy is unable to afford them employment. Labor unions which close their ranks to the public thereby assume a sovereignty which is not theirs to assume. The whole field of available workers should likewise be made available to the em-

ployer for choice with respect to skill and the many personality factors. The closed shop as an instrumentality of a labor union, membership wherein is reasonably open to the public, establishes a desirable rule governing industrial enterprise. The closed shop at the hands of a labor union which substantially excludes the public from its benefits, on the other hand, is a means whereby an anti-social monopoly is foisted upon the industrial body politic.''

■ The public policy declared in § 2 and made a rule of interpretation for the courts, expresses solicitude for ''the individual unorganized worker'', and the state's conviction that he should have the benefit of full freedom of association with his fellows and of collective bargaining; but the statute is now invoked as a shield to protect the defendants in their effort, not only to make themselves the exclusive beneficiaries of its provisions but, in the process, to deprive the plaintiff's employes in the same craft of their means of livelihood. The only substantial controversy between the parties grows out of the union's demand that the plaintiff join it in its monopolistic aim. In our opinion, that does not constitute a labor dispute within the meaning of that term, as defined in our anti-injunction statute.

■ It is contended that the defendants' acts are immune from the injunctive process under the guaranty of freedom of speech in the Federal Constitution, as construed by the Supreme Court in *Thornhill v. Alabama*, 310 U. S. 88, 60 S. Ct. 736, 84 L. ed. 1093, and *Carlson v. People of State of California*, 310 U. S. 106, 60 S. Ct. 746, 84 L. ed. 1104. In these cases, and in *American Federation of Labor v. Bain*, 165, Or., p. 183, supra, 106 P. (2d) 544, 130 A. L. R. 1278, decided on their authority, state statutes, containing sweeping prohibitions of picketing were held to invade the

right to freedom of speech secured to all persons by the Fourteenth Amendment against abridgement by a state. But, we think that those decisions are not controlling in a case like this of concerted action to accomplish an unlawful purpose. For, as the Supreme Court held in *Gompers v. Bucks Stove & Range Co.,* 221 U. S. 418, 439, 31 S. Ct. 492, 55 L. ed. 797, 34 L. R. A. (N. S.) 874 (a case not referred to in the Thornhill and Carlson cases and, therefore, we assume, not overruled):

"In the case of an unlawful conspiracy, the agreement to act in concert when the signal is published, gives the words 'Unfair', 'We Don't Patronize', or similar expressions, a force not inhering in the words themselves, and therefore exceeding any possible right of speech which a single individual might have. Under such circumstances they become what have been called 'verbal acts', and as much subject to injunction as the use of any other force whereby property is unlawfully damaged."

See, to the same effect, *Campbell v. Motion Picture Operators' Union,* 151 Minn. 220, 186 N. W. 781, 27 A. L. R. 631, 638.

Since the defendants' activities were directed to the accomplishment of an unlawful purpose and threatened, if continued, to cause irreparable damage to the plaintiff's business, he is entitled, under settled principles of equity, to injunctive relief.

For these reasons, the decree of the circuit court is affirmed. No costs or disbursements will be allowed.

KELLY, C. J., and BELT, BAILEY, RAND and ROSSMAN, JJ., concur.

BEAN, J., not sitting.