Argued January 6; affirmed March 23, 1943

# MARKHAM & CALLOW, Inc., *v.* INTERNATIONAL WOODWORKERS OF AMERICA, LUMBER & SAWMILL WORKERS UNION, ET AL.

(135 P. (2d) 727)

Before Bailey, Chief Justice, and Belt, Rossman, Kelly, Lusk, Brand and Hay, Associate Justices.

*W. J. Prendergast, Jr.,* of Portland (David Weinstein, of Portland, on the brief), for appellants.

*Gunther F. Krause,* of Portland (George E. Birnie, of Portland, on the brief), for respondent.

522

524

530

BRAND, J. It was the contention of the discharged defendant employees that the employer by the act of

discharging them became guilty of an unfair labor practice and discrimination. If the employer was not, under the contract, required to discharge the defendants, then there would be support for the defendants' contention. On the other hand, if the discharge of the defendants was obligatory upon the employer under the terms of a valid contract, then the picketing could not be construed as a mere attempt on the part of the discharged employees to enforce re-employment, and it would be necessary to hold that the picketing was done for the direct purpose of forcing the employer to break the contract.

The first question for decision therefore relates to the construction of the supplemental working agreement of March 26, 1941. That agreement, to which we have already referred, reads as follows:

"Article II of said working agreement of October 1, 1939, is hereby amended to read as follows:

ARTICLE II.

"(a) The Company recognizes the Union as the sole and exclusive bargaining agency for all of its employees except superintendents, foremen and office personnel. This agreement and the provisions herein constitute the only collective bargaining agency recognized by the Company.

"(b) It is the desire of the parties hereto that the employees covered by this Agreement shall maintain membership in good standing in the Union. In order that this desire may be effected and the Union may discipline its members for the effective operation of this agreement, the Company agrees to release from its employ any person, within 15 days after receipt of formal written demand from the Union, who refuses to maintain membership in good standing in the Union. It is expressly understood and agreed that all present employee members of the Union shall maintain membership in the

Union, and present employees who are not members shall be accepted into membership in the Union within a reasonable length of time and shall maintain such membership during the life of this agreement.

"(c) The Company shall have the sole and exclusive right to hire all new employees, but all such new employees shall be hired on the basis of a trial period, which shall consist of thirty (30) days of continuous employment. During such trial period, the new employee shall not be covered by the provisions of Articles III and VII. After thirty (30) days of continuous employment, such new employee shall, if continued on the job, become a member of the Union.

"2. Article XI-(b) of said working agreement of October 1, 1939, is hereby eliminated.

"3. Except as herein amended, all of the terms and agreements contained in the working agreement of October 1, 1939, shall remain in full force and effect."

■ The defendants contend that the parties to the above agreement had expressed only the *desire* that certain action be taken and that there was no intention expressed in the contract to bind the parties to a union shop agreement. The position of the defendants in this respect is untenable. The expressed purpose of the agreement was to enable the union to discipline its members, and to that end the company *agreed* upon demand to discharge any person who refused to maintain membership. If this were the extent of the agreement it might well be argued that the contract was for "maintenance of membership" rather than for a union shop, but the contract does not end there. All present employee members are to maintain their membership, present employees not members shall be accepted into membership and shall maintain such membership, and

it is then provided that all new employees shall, if continued on the job, become members of the union. We think that the instrument itself clearly expresses the agreement of the parties that all employees shall remain or become and remain members of the union.

■ If, however, it should be considered that the wording of the contract is ambiguous, the surrounding circumstances and the practical construction placed thereon by both parties thereto would conclusively establish the same construction. It must be remembered that the original contract of October 1, 1939, had been considered by the bargaining agency to amount to a union shop contract, that acting upon that belief they had demanded the discharge of an employee who was not a member of the bargaining agency and that they had gone on strike to enforce their demands. Upon the advice of the federal conciliator that they "work out something better" the supplemental agreement of March 26, 1941, was demanded, for the express purpose of supplying the defect which had been discovered in the contract of October 1, 1939. Upon the execution of the supplemental agreement of March 26, 1941, both the union and, reluctantly, the employer, the parties to the contract, consistently recognized it as binding them to a union shop agreement. This court cannot ignore the plain language of the contract and the practical construction placed upon it by both parties and accept in lieu thereof the interpretation of a few employees, who, although they refused to recognize the contract, did nevertheless recognize the union which executed it as the exclusive bargaining agency for all the employees including themselves.

■ Our opinion must be based on all of the relevant facts as above narrated, but the facts and issues may

be summarized briefly as follows: The employer is engaged in interstate commerce and is therefore subject to the National Labor Relations Act. Pursuant to that act and under the supervision of the National Labor Relations Board, the plaintiff's employees had, at a valid election by ballot, chosen the A. F. of L. Local union as the exclusive representative of all of the employees for the purpose of collective bargaining, and the union was certified to be such by the board. A majority of the employees have in fact been members of that union from the date of the election down to and after the date of the picketing. The union as exclusive bargaining agent for all of the employees has entered into a union shop contract with the employer. Concerning the purport of that contract all employees were fully informed by the union and by the employer. The defendant employees notwithstanding the notice and knowledge of the terms of the contract refused to join the union having the bargaining agency although membership therein was open to them. Whereupon, on demand of the union and in strict compliance with the terms of the contract, the employer discharged the refusing employees. The discharged employees who were members of a rival union proceeded to picket the employer's operation.

Upon this state of facts the defendants asserted that a "labor dispute" existed within the meaning of the Oregon Code, 102-913 to 102-925, commonly called the Oregon Norris-LaGuardia Act, and that the court was therefore without power to issue an injunction.

The defendants' second contention is that even if the facts did not constitute a "labor dispute" within the meaning of the statute, the injunction in question constituted a violation of the defendants' fundamental

rights of free speech guaranteed by the provisions of the Fourteenth Amendment to the Constitution of the United States.

Attention is first directed to the issue concerning a "labor dispute." As stated in appellant's brief,

"This court has not heretofore been called upon to construe the law in a case such as the one at bar."

Article III, Chap. 9, of the Oregon Labor Code, commonly called the Oregon Norris-LaGuardia Act, provides in part as follows:

"The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employe." O. C. L. A. 102-925.

Under other provisions of the statute, if a "labor dispute" exists and a case involves or grows out of a "labor dispute", the court cannot enjoin any person "participating or interested in" such dispute from peaceful picketing, that is, from picketing which does not involve fraud, violence or intimidation. It is provided, however, that an injunction may issue even in a case involving a labor dispute if the court upon the evidence makes certain findings of fact as required by O. C. L. A. 102-919. One of the required findings the making of which is a condition precedent to the issuance of an injunction is that

"* * * unlawful acts have been threatened and will be committed unless restrained, or have been committed and will be continued unless restrained * * *."

The statute does not specify what shall be deemed to be "unlawful acts" within the meaning of the text. The findings of fact required as a condition precedent to the issuance of an injunction where a labor dispute exists were not made in the case at bar. It follows that if the case at bar involved or grew out of a labor dispute, and if the injunction was issued against persons participating or interested in such labor dispute, then the injunction must be vacated. Otherwise, the propriety of the injunction will be decided on common law and constitutional considerations, uneffected by Article III of the Labor Code.

It is clear that a "labor dispute" existed prior to the election which resulted in the certification of the bargaining agency. We think a labor dispute also existed between the A. F. of L., as bargaining agency, and the employer, when, after the Scovell incident, the union was demanding a new contract with union shop provisions and threatening to strike if the employer did not yield. But the employer did yield, and that controversy was completely ended by the execution of the desired contract. Here, however, the plaintiff employer and the A. F. of L. union as certified bargaining agency were both in harmonious performance of a union shop contract which, as we shall show, bound the minority defendant employees who were members of the C. I. O. as well as all the other employees. The controversy was exclusively jurisdictional. No other substantial issues were involved, as for instance wages, hours or the like. The only issue was the right of the plaintiff and the bargaining agency to carry out their valid contract, and the question in this suit is the right of the minority to picket the plaintiff's operation as a means of coercing the plaintiff into breaking the contract. Under

these conditions, it is urged that whatever labor dispute may have existed in the past had ended prior to the picketing.

Upon this issue we must consider the effect of the National Labor Relations Act (U. S. C. A. Title 29, Ch. 7, § 151-166) which provides in part as follows:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection." U. S. C. A. Title 29, Ch. 7, § 157.

Among other unfair labor practices condemned by the statute it is provided that,

"It shall be an unfair labor practice for an employer—* * *

"(3) By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided*, That nothing in sections 151-166 of this title or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in sections 151-166 of this title as an unfair labor practice) to require as a condition of employment membership therein, if such labor organization is the representative of the employees as provided in section 159 (a) of this title, in the appropriate collective bargaining unit covered by such agreement when made." U. S. C. A. Title 29, Ch. 7, § 158 (3)

Section 159 of the act provides in part as follows:

"(a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for

such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: *Provided*, That any individual employee or a group of employees shall have the right at any time to present grievances to their employer.

"(b) The Board shall decide in each case whether, in order to insure to employees the full benefit of their right to self-organization and to collective bargaining, and otherwise to effectuate the policies of sections 151-166 of this title, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof.

"(c) Whenever a question affecting commerce arises concerning the representation of employees, the Board may investigate such controversy and certify to the parties, in writing, the name or names of the representatives that have been designated or selected. In any such investigation, the Board shall provide for an appropriate hearing upon due notice, either in conjunction with a proceeding under section 160 of this title or otherwise, and may take a secret ballot of employees, or utilize any other suitable method to ascertain such representatives."

■ That act, unlike the federal Norris-LaGuardia Act, U. S. C. A. Title 29, §§ 101 to 115, draws its vitality from the commerce clause of the federal constitution and therefore, affects the substantive law of the states when questions arise concerning the rights and duties of employers and employees who are engaged in interstate commerce. The plaintiff and its employees were so engaged. We recognize that current authorities have established that a controversy between two labor unions may be a "labor dispute", but it does not necessarily follow that all such controversies are and remain such.

The defendants cite two decisions, both from New York state, in support of their contention that a labor dispute existed notwithstanding the election, certification and contract pursuant to the election. They are *Stalban v. Friedman,* 259 App. Div. 520, 19 N. Y. S. (2d) 978 and *Fairbanks Cube Steak House, Inc., v. Viera,* 259 App. Div. 804, 19 N. Y. S. (2d) 776. The Stalban case was first tried in the supreme court, special term, New York county, on May 30, 1939 (171 Misc. 106, 11 N. Y. S. (2d) 343.) The facts are as follows: After a prolonged shut-down plaintiff's restaurant re-opened, hired a new crew, all of whom were members of the Delicatessen Union, Local No. 1 of the American Labor Alliance. The plaintiff thereafter signed a contract with that union. The defendants, Waiters and Cooks Union, affiliated with the A. F. of L., immediately picketed the restaurant. None of the former employees were concerned in the controversy. None of the defendants had ever been employed by the plaintiff. Both unions sought certification as the bargaining agency from the State Labor Relations Board, pursuant to the provisions of the Labor Relations Act, Labor Law, Consol. Laws, C. 31, Section 700 et seq., a statute modeled after the National Labor Relations Act, Title 29, U. S. C. A., section 151, et seq. The state board ruled, however, that no controversy existed concerning the fact that the union (American Labor Alliance, Local No. 1) represented plaintiff's employees. The board advised the plaintiff as follows:

"Under the circumstances, this Board is without jurisdiction to proceed in the matter."

The petition for certification was dismissed. The defendant unions in plaintiff's suit to enjoin picketing

contended that by the foregoing action the state board had refused to certify either union,

"* * * and that as long as no certification exists, picketing is lawful and cannot be enjoined."

(We think that the board's ruling to the effect that it was without jurisdiction supports the defendants' contention and that no certification had in fact been made.) After reviewing the decisions, the court held that certification was not necessary to end a labor dispute.

"There are many labor disputes which never go to certification. * * * What would certification do more than is shown to have been done here? The plaintiff's seven employees have signed agreements and have expressly refused to join defendant-locals." *Stalban v. Friedman* (supra) at p. 350.

It was held that no labor dispute existed, and an injunction issued.

After this decision in the Stalban case and before its reversal by the supreme court, appellate division, on May 17, 1940, two other decisions were rendered, to-wit: *Euclid Candy Co. of New York v. Summa,* 174 Misc. 19, 19 N. Y. S. (2d) 382, decided March 25, 1940, supreme court, special term, King's County, and *Fairbanks Cube Steak House, Inc., v. Viera,* (supra) decided on April 5, 1940. The opinion of the supreme court, special term, in the Fairbanks Cube Steak House case was not reported. The nature of the decision, however, is disclosed in the following excerpt from the case of *Brook-Maid Food Co. v. Goldberg,* 21 N. Y. S. (2d) 985, where the court said:

"And the court in that case cited Fairbanks Cube Steak House, Inc., v. Viera et al., 259 App.

Div. 804, 19 N. Y. S. 2d 776. In the latter case an examination of the record on appeal discloses that the plaintiff, a restaurant owner, sought to enjoin the defendant union from picketing its premises. There were no members of the defendant union who were employees of plaintiff. Despite the fact that the New York State Labor Relations Board had certified that another union was the exclusive bargaining representative for the plaintiff's employees, the court denied the motion. While neither the court below nor the Appellate Division wrote an opinion in the case it is evident from the record on appeal that the only question before the court was that as to whether or not there was a 'labor dispute' in the case." *Brook-Maid Food Co. v. Goldberg* (supra) at p. 383.

It thus appears that the trial court in the Fairbanks Cube Steak House case held that a labor dispute existed, notwithstanding certification by the New York State Labor Relations Board. The decision was affirmed without opinion by the appellate division on April 5, 1940, in 259 App. Div. 804, 19 N. Y. S. (2d) 776.

In the same volume of reports we find the decision of the supreme court, special term for King's County, in the case of *Euclid Candy Co. of New York v. Summa* (supra). This case bears a striking resemblance to the case at bar. The two contesting unions, the independent Confectionery Workers Union, and Local 452, A. F. of L., agreed that an election be held under the National Labor Relations Act for the purpose of certifying a sole collective bargaining representative and that the plaintiff employer should enter into a closed shop agreement with the winner. The election was held by secret ballot. The National Labor Relations Board certified the independent union. The

plaintiff executed a closed shop agreement with the independent union requiring that all employees not now members of the union be required to join. Notice of the terms of the contract was published. The A. F. of L. union went on strike and picketed. The independent union joined in the prayer for relief by the plaintiff employer. The court said:

"Although in the course of the oral argument counsel for local 452 conceded that in this controversy no labor dispute, within the meaning of § 876-a Civil Practice Act, was involved, he nevertheless contends in his memorandum that the instant controversy is a labor dispute. Notwithstanding the broad language of the statute in defining a labor dispute, the controversy existing between the parties herein does not, in the court's opinion, come within the purview of said statute. There was a labor dispute prior to the certification by the National Labor Relations Board. This certification, following an election duly held by that Board pursuant to the agreements above referred to, brought that labor dispute to a conclusion. It would be anomalous, under these circumstances, to say that the labor dispute still exists merely because a minority of employees, apparently dissatisfied with the result (The National Labor certification) is unwilling to abide by the will of the majority. Cf. Oberman & Co., v. United Garment Workers of America, D. C. 21 F. Supp. 20; Union Premier Food Stores, Inc., et al. v. Retail Food Clerks and Managers Union, Local No. 1357, 3 Cir. 98 F. 2d 821; Stalban v. Friedman, 171 Misc. 106, 11 N. Y. S. 2d 343. There being no labor dispute, the sole purpose of the minority union would seem to be to induce the breach of the contract which the certified union entered into with the plaintiff, and which contained the provisions for a closed shop, pursuant to the agreement entered into by both unions prior to the election. The plaintiff has thus been

placed in a dilemma. If it accedes to the demands of the minority union, it breaches its contract with the certified union. If it attempts to abide by the terms of said contract, as it did in the instant case, it has a strike on its hands, and picketing and other activities that go with it. It seems to the court that since the picketing by the minority union is, in effect, an attempt to force the breach of the agreement which was entered into under the circumstances above described, this court of equity should prevent the irreparable injury which flows therefrom." *Euclid Candy Co. of New York v. Summa* (supra) at p. 384.

Shortly after the decision of the Euclid Candy case, the case of *Stalban v. Friedman* was decided by the appellate division on May 17, 1940, in 259 App Div. 520, 19 N. Y. S. (2d) 978. The decision of the supreme court, special term, hereinabove reviewed, was reversed, and by a brief per curiam decision it was held that a labor dispute was involved,

"* * * even though members of the defendant unions were not employed by the plaintiff."

Since the plaintiff had failed either to plead or prove the facts required by section 876-a of the Civil Practice Act (the New York Norris-LaGuardia Act) it was held that there could be no injunctive relief. By way of dictum it was held that

"The question is not affected by the fact, if it be a fact, that the State Labor Relations Board has held that the Union whose members are now employed by the plaintiff is the proper agency for collective bargaining." (Citing *Fairbanks Cube Steak House, Inc., v. Viera,* supra.)

(It will be recalled that the opinion of the lower court makes it clear that the Labor Relations Board had not certified either union.)

Shortly after the decision of the appellate division in the Stalban case, and on July 2, 1940, the appellate division, second department, unanimously affirmed the Euclid Candy Company case (supra) thereby upholding the right of the trial court to issue an injunction notwithstanding the provisions of the anti-injunction act 259 App. Div. 1081, 21 N. Y. S. 2d 614.

The next case deserving our attention is the case of *Florsheim Shoe Co., Inc. v. Retail Shoe Salesmen's Union of Brooklyn and Queens Local 287*, first tried in the supreme court, special term, for King's County, on December 21, 1940, 24 N. Y. S. (2d) 923. The facts were as follows: In the course of a long controversy involving the plaintiff employer and two rival unions, the New York State Labor Relations Board caused an election to be held, and pursuant thereto the board certified that Local No. 1115-F, A. F. of L., had been designated as representative for the purpose of collective bargaining by a majority of all of the plaintiff's employees and that said union was the exclusive representative of all such employees for such purposes. In compliance with the mandate of the board the plaintiff bargained with the certified union with the result that a closed shop contract was executed. Thereafter the unsuccessful rival union continued to picket. The plaintiff brought suit to enjoin the same. The court cited *Euclid Candy Co. of New York v. Summa*, supra, with approval, and said:

"If picketing by the defendant unions were permitted, plaintiffs would suffer serious and irreparable injury, and such injury would come to them as the price they would have to pay for their compliance with the lawful dictates of the state board. If it were found that a labor dispute was involved herein this motion for an injunction

pendente lite would fall. There is nothing submitted which would justify the inference that the union selected by the plaintiff's employees would not meet the full requirements of labor; and it might even be assumed that the labor rights of such employees have been duly safeguarded by the said union." *Florsheim Shoe Co., Inc. v. Retail Shoe Salesmen's Union* (supra) at p. 925.

It was held that no labor dispute existed and an injunction issued. Thereafter, the case went to the supreme court, appelate division, second department, where it was decided in May 26, 1941, in 262 App. Div. 769, 27 N. Y. S. (2d) 883. In a memorandum opinion that court said:

"Plaintiffs brought an action for injunctive relief on motion were accorded relief pendente lite. Defendants appealed from the order and asserted that the complaint was insufficient in law because it failed to set out allegations required by section 876-a, Civil Practice Act. This is advanced on the theory that a 'labor dispute' exists in the situation. The New York State Labor Relations Act, Labor Law, Art. 20 § 700 et seq., is susceptible of the interpretation that a 'labor dispute' is resolved when during the course of a strike an election is held in which the rival unions participate, and one or the other is selected as a bargaining agent and that bargaining agent makes a closed-shop agreement with the employer. This view may be sustained on the theory that the several unions and the employers have submitted to the jurisdiction of the Labor Board and are bound by the determination that ensues—at least for the period of one year. Such a view would lead to industrial peace and the avoidance of public disturbance, disorder and unjustifiable economic harm, which are underlying purposes of the State Labor Relations statute as envisaged by the Board. Matter of Crystal Cab

Corp., N. Y. S. L. R. B. Decision No. 51, January 15, 1938. It would also eliminate a fertile field for the practice of oppression or extortion by representatives of rival minority unions or independent groups." *Euclid Candy Co. of New York v. Summa* (supra.)

Notwithstanding its own persuasive argument, the court, however, felt that it was bound by the federal decisions and therefore held that a labor dispute still existed and that the injunction was improperly issued.

The conflict between the various New York courts was finally put to rest in the decision of the Florsheim case by the New York Court of Appeals, June 4, 1942, in 288 N. Y. 188, 42 N. E. (2d) 480. That court reversed the order of the appellate division and affirmed the order of the supreme court, special term, which had granted an injunction. The court said:

"The decisive question here, upon the basis above outlined, is whether the facts show that at the time of the commencement of this action a 'labor dispute' existed between the parties within the meaning and intent of the provisions of section 876-a of the Civil Practice Act in view of the declared legislative policy of the state.

"The controversy has at all times been essentially jurisdictional—based upon a contest between rival unions to determine which should be recognized by plaintiffs as collective bargaining agent for the plaintiffs' employees. On the one side was the Retail Shoe Salesmen's Union, Local 1115f, A. F. of L., and on the other side were Retail Shoe Salesmen's Union, Locals 1268 and 278, C. I. O. For the purposes of this case we assume without deciding that the controversy started out as a 'labor dispute' between the parties to this action within the meaning of section 876-a of the Civil Practice Act."

The court of appeals further said:

"When the contract was executed by appellants and the duly certified agent of the employees and went into effect, any labor dispute within the provisions of the New York State Labor Law ended and the contract as made was the sole enforceable contract between employers and employees. Cf. Matter of Triboro Coach Corporation v. New York State Labor Relations Board, 286 N. Y. 314, 36 N. E. 2d 315. Such a result is the only conclusion possible in consonance and harmony with the public policy of the State as declared in the Labor Relations Act which was to prevent or bring to an end strikes and other forms of industrial strife and unrest and to encourage and effect industrial peace among employers and employees. United Baking Co. v. Bakery & Confectionery Workers' Union, 257 App. Div. 501, 14 N. Y. S. 2d 74. The Legislature did not intend or propose that the procedure provided for that purpose should be meaningless or that it might be flaunted and made meaningless by a minority group of employees, who, themselves, had invoked the procedure to settle their dispute. The intent and purpose of the Legislature was to provide procedure for the disposal of labor controversies which, when adopted and availed of by parties to those controversies, *should end disputes, not continue them.*"

The court said further:

"The announced objective was to compel plaintiffs, in spite of the wishes of the great majority of their employees and the execution of the collective bargaining agreement, to enter into a closed shop agreement with the defendants and to compel the recognition of the defendants as the sole and exclusive bargaining agent."

"On the record here presented it is impossible for the respondents successfully to maintain that any 'labor dispute' between plaintiffs and de-

fendants theretofore existing under section 876-a of the Civil Practice Act survived the certification by the Labor Relations Board of the collective bargaining agent for plaintiffs' employees and the execution of the collective bargaining contract.''

''The action here is to restrain unlawful actions and their threatened continuance not governed by procedure other than a general action in equity. Compare Busch Jewelry Co. v. United Retail Employees Union, 281 N. Y. 150, 22 N. E. 2d 320, 124 A. L. R. 744. It was unlawful, upon the record in this case, for the defendants to continue or renew or to threaten to continue picketing of appellants' shops for the reason that the minority were dissatisfied with the result of the election and with the terms of the contract duly negotiated and entered into between the appellants and the duly certified representative of the employees.'' *Florsheim Shoe Store Co. v. Retail Shoe Salemen's Union* (supra), 288 N. Y. 188, 42 N. E. 2d 480, at pp. 482, 484, 485.

The decision of this, the highest court of New York, clearly renounces the doctrine relied upon by the defendants as set forth in *Stalban v. Friedman* (supra) and *Fairbanks Cube Steak House, Inc., v. Viera* (supra) and approves the conclusions reached in *Euclid Candy Co. v. Summa* (supra). The decision is directly in point.

Plaintiff relies on *Oberman & Co. v. United Garment Workers of America*, 21 F. Supp. 20, District Court, Missouri, decided September 29, 1937. The suit was instituted by the plaintiff, who was a manufacturer engaged in interstate commerce, for the purpose of enjoining picketing. The decision is persuasive in the instant case. The majority of plaintiff's employees had been organized in a local union known as the Springfield Oberman Employees' Association.

That union was authorized to act as collective bargaining agency and entered into a closed shop contract with the employer. Thereafter Local 216 of the United Garment Workers of America claimed a majority of the employees as its members with the correlative right to represent the employees in collective bargaining and demanded the abrogation of the contract with the Oberman Association. The plaintiff refused to recognize Local 216 until an election should be held to determine the choice of the workers for collective bargaining purposes, whereupon the defendant, Local 216, called a strike. Ultimately, at the plaintiff's request, the National Labor Relations Board held an election and certified the Oberman Employees' Association as the collective bargaining agency. A new contract was entered into between the Oberman Association and the plaintiff which, however, eliminated the closed shop provision. Local 216, however, continued its demand that the plaintiff contract with it as the sole representative of all the employees and to demand a closed shop for the United Garment Workers. Picketing and violence followed. The defendants challenged the jurisdiction of the federal court on the ground that the plaintiff had not followed the provisions of the Norris-LaGuardia Act. The court said:

"It must be conceded that, if the present litigation falls within the purview of the Norris-LaGuardia Act and there is in fact a labor dispute, then the restraining order was improvidently granted and the bill should be dismissed."

"The full purpose of the act was to encourage and protect employees in this procedure for collective bargaining. The bill clearly shows that the difficulties experienced in this case were not in a labor dispute, but in the procedure for collective bargaining."

"Most emphatically, therefore, the entire proceeding was not under the Norris-LaGuardia Act, supra, but was under the Wagner-Connery Act, commonly known as the National Labor Relations Act. If there was a dispute, it was in connection with the procedure under that act."

"According to the averments of the bill there could not be a labor dispute in this case. It was authorized to do this by statute. Its certificate stands unchallenged.

"As said in an analogous case by the Supreme Court in Virginian Ry. Co. v. System Federation No. 40, 300 U. S. 515, loc. cit. 562, 57 S. Ct. 592, 606, 81 L. Ed. 789: 'Its certificate that the Federation is the authorized representative of the employees is the ultimate finding of fact prerequisite to enforcement by the court of the command of the statute. * * * The certificate which conformed to the statutory requirement, was prima facie sufficient, and was not shown to be invalid for want of the requisite supporting facts.' "

"As was said in Virginian Ry. Co. v. System Federation No. 40, supra, 300 U. S. 515, loc. cit. 562, 57 S. Ct. 592, 601, 81 L. ed. 789: 'Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interests than they are accustomed to go when only private interests are involved. * * * The fact that Congress has indicated its purpose to make negotiation obligatory is in itself a declaration of public interest and policy which should be persuasive in inducing courts to give relief. " *Oberman & Co. v. United Garment Workers of America* (supra).

The picketing was enjoined.

The Oberman case is cited with approval in *M & M Wood Working Co. v. Plywood & Veneer Workers Local*, 23 F. Supp. 11, decided January 10, 1938, opinion by Fee, J.

Plaintiff also relies strongly upon *Bloedel Donovan Lumber Mills v. International Woodworkers of America,* 4 Wash. (2d) 62, 102 P. (2d) 270, decided May 6, 1940. It is unnecessary to review the facts at any length because they are almost identical with those in the case at bar. The plaintiff was in interstate commerce. The case arose in a state court. The state's anti-injunction act was involved. The A. F. of L. union was certified as the result of the National Labor Relations Board election. A union shop contract was made. Both unions recognized the validity thereof. The certified union was an open union, extending the right of membership to the non-member employees. Certain C. I. O. non-members refused to join. The A. F. of L. demanded their discharge, and the employer discharged them. Picketing resulted. The court said:

"We are of the opinion appellants have failed to take into consideration that, at the time the proposal of October 2nd was presented and ratified, there had been a determination by the National Labor Relations Board of an exclusive bargaining agency, and a working agreement entered into between respondent and that agency, and that the proposal of October 2nd expressly recognized those facts.

"Without deciding to what extent, if at all, the Wagner Act (29 U. S. C. A. §§ 151-166) has superseded our anti-injunction act, we are clearly of the opinion that where interstate commerce is involved, the National Labor Board has been given exclusive initial jurisdiction to determine the appropriate and lawfully selected bargaining unit for employees. Fur Workers Union, Local No. 72 v. Fur Workers Union, No. 21238, 70 App. D. C. 122, 105 F. 2d 1. That a situation such as here presented sufficiently affects interstate commerce to make the Wagner Act applicable, has been determined in National Labor

Relations Board v. Jones & Laughlin Steel Corp. 30 U. S. 1, 57 S. Ct. 615, 81 L. Ed. 893, 108 A. L. R. 1352. Appellant union invoked the aid of the National Labor Relations Board to settle its difficulties, and obtained an adverse decision, and we think it must be bound by that decision.

"Continuing to act under the authority of the Wagner Act, and especially under § 158, subd. (3), which states: 'Provided, That nothing in this chapter, or in sections 701 to 712 of Title 15, or in any code or agreement approved or prescribed thereunder, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this chapter as an unfair labor practice) to require as a condition of employment membership therein, if such labor organization is the representative of the employees as provided in section 159 (a) of this title, in the appropriate collective bargaining unit covered by such agreement when made,' respondent and Local 2667 entered into a closed shop agreement."

"That no labor dispute can exist between a minority union and an employer, under facts such as disclosed by this record, has been decided in Oberman & Co. v. United Garment Workers of America, D. C. 21 F. Supp. 20. The following cases, while not expressly so holding, strongly intimate that where the National Labor Relations Board has determined the exclusive bargaining agency, as provided in the Wagner Act, there cannot thereafter be any labor dispute between the employer and the minority union: Fur Workers Union Local No. 72 v. Fur Workers Union No. 21238, supra; Donnelly Garment Co. v. International Ladies' Garment Workers' Union, D. C. 23 F. Supp. 607. That an employer has a legal right to deal exclusively with the agency found by the National Labor Relations Board to represent a majority of the employees has been

determined in Grace Co. v. Williams, D. C. 20 F. Supp. 263; Cupples Co. v. American Federation of Labor, D. C. 20 F. Supp. 894; and National Labor Relations Board v. Jones & Laughlin Steel Corp., supra.''

''Certainly, if there is to be economic peace and an orderly adjustment of the question of who, as between two contesting unions, shall be the exclusive bargaining agency of employees, such unions, as well as the employer, should be bound by the certificate made by the National Labor Relations Board, which has, in a case such as here presented, been given by Congress the exclusive initial jurisdiction to make that determination. Also, such contesting unions and their members, as well as the employer, should be bound by agreements made and entered into in good faith, as was the working agreement of April 17th and the proposal of October 2nd, under and pursuant to the provisions of the Wagner Act.''

The Oberman and Bloedel cases were both cited with approval in *Schwab v. Moving Picture Machine Operators Local No. 159*, 165 Or. 602, at p. 610, 109 P. (2d) 600, decided January 28, 1941, and in the well considered case of *White v. Murphy*, 310 Mass. 510, 38 N. E. (2d) 685, January 2, 1942.

The next case on which plaintiff relies is *Union Premier Food Stores, Inc., v. Retail Food Clerks and Managers Union, Local No. 1357*, 98 F. (2nd) 821, Circuit Court of Appeals, Third Circuit, decided August 12, 1938. In this case the plaintiff employer was engaged in interstate commerce and sought an injunction against four A. F. of L. unions to restrain picketing. The A. F. of L. and C. I. O. unions were engaged in a conflict concerning representation, each side asserting the right to represent the employees of

the plaintiff as their sole collective bargaining agent. The plaintiff maintained neutrality. The court said:

"This question had to be determined by the Board and could not be determined, under the facts in this case, by the plaintiffs. They said then, as they have declared over and over again ever since, that they were willing to enter into a 'union agreement' in accordance with the provisions of the Act with either union, whichever was entitled to represent their employees; that all they wanted to know was with which union or unions they could legally enter into a contract as legal representative for the purpose of collective bargaining in accordance with the provisions of the Act."

The issue on the suit for injunction arose while the question of representation was pending before the National Labor Relations Board and therefore prior to any certification.

"The fundamental question here, as stated above, is whether or not under the facts of this case there was a labor dispute involving the plaintiffs within the meaning of the Wagner Act. Of course there was a 'labor dispute' or the Board could not have taken jurisdiction and proceeded to determine the question in issue, but the dispute was and is entirely between the unions. The plaintiffs are not disputing with anyone."

"The unions are the 'disputants' and as to this dispute they do not now stand in 'proximate' or other relations to the plaintiffs or their employees within the meaning of the Wagner Act. Congress meant to help both capital and labor by the passage of this Act and when the Board has taken jurisdiction and is determining the only question in dispute between the unions, it did not intend to destroy the great business of any employer who stands willing and ready to obey any and all provisions of the Act as soon as told by the Board what to do."

"Since there was no 'labor dispute' in this case in which plaintiffs were involved, the District Court was not bound by the provisions of the Norris-LaGuardia Act, 29 U. S. C. A. § 101 et seq., but had power to grant the restraining order and we think it wisely exercised that power."

"In such a case as we have here, where the controlling and only question is which of two labor unions is the collective bargaining agent of the employees of the plaintiffs, and the employers take no part in such dispute, but, on the contrary, are willing to abide by the decision of the Board and contract with the union it designates, it is manifest that the Board, and it alone, has jurisdiction to decide that question by an election and, as conceded at the argument, the court below had no power to order an election and to that extent its order is vacated; but on the question before us, whether or not we should grant a supersedeas of the injunctive order of the court, pending a decision by the Board as to what organization is the lawful bargaining agent of the plaintiffs' employees with which the plaintiffs must bargain, we think the supersedeas should be denied and the status in quo preserved until the Board acts. Such denial will prevent irreparable injury to the plaintiffs and the ruin of its business and at the same time do little, if any, harm to defendants." Union Premier Food Stores, Inc., v. Retail Food Clerks and Managers Union, Local No. 1357 (supra) at pp. 823, 825, 826. Decision affirmed, 101 F. (2nd) 475, Certiorari granted 307 U. S. 619, case dismissed as moot, 308 U. S. 526.

In the case of *Sharp & Dohme v. Storage Warehouse Employees' Union*, United States District Court (Pa.) 24 F. Supp. 701, the court takes an intermediate position. It holds that where the jurisdiction of the National Labor Relations Board had not been invoked in a jurisdictional dispute, a "labor dispute" continues. But it expressly approved the doctrine of the Union

Premier Food Stores case upon the ground that in the latter case the jurisdiction of the Labor Relations Board had been invoked, although no election or certification had been made. Speaking of the Union Premier Food Stores case the court said:

"The parties to that dispute were in consequence properly enjoined from an Appeal to the arbitrament of force. There was no Labor dispute within the meaning of the Norris-LaGuardia Act and hence that Act did not apply."

Referring to the Union Premier Food Stores case and the Oberman case, both supra, the defendants in their brief say:

"Both of these cases relied upon by the Court were also considered and disposed of by the U. S. Circuit Court in the Appeal of Fur Workers Union, Local 72 v. Fur Workers Union, 105 Fed. (2d) 17." (Decided March 27, 1939.)

Let us see in what manner those cases were disposed of in the Fur Workers case. Briefly stated, the facts were that H. Zirkin & Sons, Inc., were retail fur dealers in the District of Columbia, with twenty-five employees, eleven of whom were fur workers. The defendant C. I. O. union had attempted to secure members from among plaintiff's employees but succeeded in securing only two recruits. The employer recognized the C. I. O. union as the sole representative of the C. I. O. employees, but declined to recognize it as representative of other fur workers and declined to require them to join the C. I. O. The two C. I. O. members went on strike and commenced picketing with the assistance of the C. I. O. union. The remaining nine fur workers organized and joined an A. F. of L. union for the purpose of collective bargaining and after negotiation

made a contract with the employer, who accepted the A. F. of L. union as the exclusive bargaining representative of all of the fur workers then in Zirkin's "actual" employment. No influence was exerted by Zirkin's to secure the organization of the A. F. of L. union. The contract which was negotiated related to wages, hours and conditions of employment. We find no reference to any closed shop provision. A majority of the employees had chosen the A. F. of L. as its bargaining agency, but there was no application to or certification by the National Labor Relations Board. The trial court granted an injunction, but the case was reversed by the United States Court of Appeals for the District of Columbia.

The court reviewed the Oberman and Union Premier Food Stores cases at length and then said:

"We have given attentive consideration to the position taken by the appellees, but we nevertheless reach the conclusion that it is not a supportable one. The essential predicate of the argument is that once a majority of the employees of a particular employer have, without coercion on his part, made their choice of a bargaining unit, any labor dispute which may be said to have been involved theretofore has ended; therefore the restrictions of the Norris-LaGuardia Act upon the issuance of injunctions are inoperative. Applying this proposition to the instant case the appellees say that the trial court has found that a majority of the employees of Zirkin's have selected the appellee union as their collective bargaining agency; therefore the labor dispute has ended and injunction may issue in protection of the choice of the majority. But this argument rests upon the assumption that the Federal courts have power to determine the lawful selection of a bargaining agency by employees. If the trial court had no such power, then its findings of fact in respect

of the selection of a bargaining agency by a majority of the employees of Zirkin's without employer coercion are without force, and it cannot be said that the labor dispute has ended so that the Norris-LaGuardia Act restrictions upon the issuance of injunctions are inoperative. We think that the assumption that the trial court had power to make the determination in question is invalid and that the appellees' whole argument therefore falls.''

The court also examined the argument:

"'\* \* \* that unless injunction can issue in such a situation, the employer may well, for lack of other remedy, see his business destroyed, because neither union may be interested in applying to the National Labor Relations Board for an election and certification, and the employer is not, under the present terms of the National Labor Relations Act, given a right to invoke the jurisdiction of the Board to investigate and determine by election proceedings the appropriate bargaining unit and the agency reflective of the will of the majority of the employees.''

Asserting that such argument is ''impressive'' the court said:

''Even if the evidence and findings are such that injunction may issue under the Norris-LaGuardia Act, still injunction is not an instrument which will excise the cause of the controversy. This can be accomplished only by an election so conducted as to result in a dependably free choice by a majority of the employees. And it is clear also that in the absence of a remedy for the employer, the dispute may proceed indefinitely, for lack of an invocation of jurisdiction of the Board by the competing unions. The union which believes itself to represent a majority may have no incentive to apply for an election; and the union which apparently has less than a majority may resist an election, at least until it is

satisfied it has won over enough to constitute a majority. It is clear further that in such a situation there is no remedy for the employer under the National Labor Relations Act. That Act makes no provision for invocation of the election and certification powers of the Board by an employer. The result is an inequality before the law as between an employer and employees in this particular, namely, that while the employer has a substantive right to carry on his business, he lacks a legal remedy for protecting the same against the injury through the struggle of competing unions, even though he be indifferent as to the choice of his employees between them; whereas the employees, in respect of their substantive rights of self-organization and collective bargaining, are afforded a protective remedy under the election and certification powers of the Board." *Fur Workers Union v. Fur Workers Union* (supra), at pp. 11 and 16.

The court's final conclusion is stated as follows:

"And we think it so clear under the Norris-LaGuardia Act and the National Labor Relations Act, considered together, that the controversy involved in the instant case is a labor dispute *and that only the National Labor Relations Board in the first instance can end that dispute by certification,* and that no injunction can issue under the Norris-LaGuardia Act in the absence of the findings required thereby, that we must enforce this plain intent of the statute without regard to the hardship upon the employer." *Fur Workers Union v. Fur Workers Union* (supra) at p. 17. (Italics ours.)

From the foregoing excerpts it clearly appears that the Oberman case and the Union Premier Food Stores case were rejected because of the view held by the court of appeals that the federal courts have no power to determine the lawful election of a lawful bargaining agency by employees, but it is equally

clear when it said that "only the National Labor Relations Board in the first instance can end that dispute by certification" that the court was of the opinion that the labor dispute would be ended by such certification.

In the case at bar no question concerning the power of the federal courts is involved, and there was a certification by the National Labor Relations Board, the absence of which was fatal to plaintiff's contention in the Fur Workers case.

In the process of construction it must be remembered that the Oregon Anti-Injunction Act, O. C. L. A. 102-913 et seq., was adopted in 1933, before the enactment of the National Labor Relations Act, and therefore before the procedure for collective bargaining had become standardized. At that time there were grave doubts concerning the validity of union shop contracts. No established procedure existed for determining the appropriate unit for collective bargaining or for the certification of the agency chosen by the majority of the employees in that unit. It can scarcely be thought that it was the intent of the state statute to limit the power of equity when asserted in aid of collective bargaining procedures which were nonexistent at the time that the act was passed. As said by this court:

"It does not, however, follow that in construing the statute for the purpose of determining whether a labor dispute, as defined in § 13, exists, the court is precluded from looking at the end sought to be accomplished by the picketing. As in other cases, it is the court's province and duty to be governed, not by the letter, but by the spirit of the law." *Schwab v. Moving Picture Machine Operators* (supra) at p. 619.

■ The provisions of the 1933 act should not be construed as nullifying or impeding the peaceful settlement of labor controversies, which settlements have been consummated by contracts lawfully executed between an employer and the legal representative of a majority of his employees. Yet that will be the unfortunate result if the defendants are permitted to picket for the purpose of inducing the breach of the collective bargaining contract in the case at bar.

■ The Oregon statute itself discloses no such intention. The public policy applicable to the construction of the act is clearly stated in O. C. L. A. 102-913, where it is declared that

"It is necessary that he [the worker] have full freedom of association, self-organization and designation of representatives of his own choosing to negotiate the terms and conditions of his employment * * *."

To what purpose is this legislative declaration of policy if the performance of a contract which embodies the "terms and conditions of his employment" and which was negotiated by "representatives of his own choosing" may be obstructed by picketing and if the very statute which was intended to foster collective bargaining is to be construed as preventing equity from protecting the very objectives for the attainment of which the statute was enacted?

■■ Again, in a case such as this, involving interstate commerce, the intent of the National Labor Relations Act must be fully considered. The question is not whether the state statute has been formally amended. If, operating within the commerce power, the federal statute establishes a national public policy, and the instant case involves interstate commerce, as it does,

then that policy must be respected by state courts, and the substantive rights concerning collective bargaining which the federal statute creates should not be impaired by construing a state statute to cover situations which were non-existent when the statute was passed.

In a case involving a situation distinguishable from the case at bar, a federal court held:

> "The provision of National Labor Relations Act securing employees' right of collective bargaining does not merely give new remedies for violations of rights created by the states, but sets up a procedure to protect a right which the act itself has basically reconstructed. National Labor Relations Act, § 7, 29 U. S. C. A. § 157." *United Electrical Radio & Machine Workers of America v. International Brotherhood of Electrical Workers*, 115 Fed. (2d) 488.

We turn to the cases cited by the defendants in support of their proposition that "a dispute between two labor organizations is a labor dispute."

In *Milk Drivers' Union Local No. 753 v. Lake Valley Farm Products, Inc.*, 311 U. S. 91, 61 S. Ct. 463, 85 L. Ed. 63, decided November 18, 1940, the plaintiff dairy sought an injunction against the A. F. of L. Milk Drivers' Union to restrain picketing. The facts differ materially from those in the case at bar. The controversy arose over the "vendor" system under which the dairies made sales of milk to individuals owning their own trucks, who resold to the retail stores. The competition under the vendor system injuriously affected the business of the dairies which employed the defendant A. F. of L. Milk Drivers' Union and resulted in loss of work to the union members. In the midst of the controversy the employees and vendors of the plaintiff dairy formed a C. I. O. union. It was the claim of the defend-

ant A. F. of L. union that the vendor system constituted unfair competition depressing laboring standards. The working hours of the employees of plaintiff dairy were longer and the wage scales lower than the union standards, with the result that the retailers who patronized the vendors were selling at cut prices. To combat this practice the defendant A. F. of L. union picketed the retail cut rate stores which bought from the vendors. The plaintiff dairy and the C. I. O. union sought to enjoin the picketing as an unlawful secondary boycott in violation of the Sherman Act. The United States District court held that

> "The picketing was an effort on the part of the defendant to compel the vendors and Wagon Drivers of the dairies to join the defendant union for the purpose of improving working conditions and wages of vendors."

The dairies had agreed with the C. I. O. union (vendors) for a closed shop and for exclusive bargaining rights. The court held that a labor dispute was involved and therefore the Norris-LaGuardia Act applies even though a secondary boycott in violation of the Sherman Act is charged. The picketing was against the retailers who bought from the vendors and who had no contract relations with the picketing union or with the dairies. The question as to the right to picket for the purpose of causing an employer to break a contract with the bargaining agency representing all employees was not presented or decided. The picketing was for the direct purpose of improving working conditions and preventing the depression of labor standards. It is true that there was a controversy between two unions, but it was one which had not been and could not be settled by any certification of a bargaining agent by a labor relations board.

Furthermore, it constituted a construction by a federal court of a federal statute which is not binding upon this court in construing a similar but not identical statute of this state.

*United States v. Hutcheson*, 312, U. S. 219, 61 S. Ct. 463, 85 L. Ed. 788, decided February 3, 1941, was a criminal prosecution against certain officers of the Carpenters and Joiners Union, A. F. of L., for conduct in alleged violation of the Sherman Act. The employer had undertaken certain work, and a controversy arose between the Machinists' Union, A. F. of L., and the Carpenters' Union, A. F. of L., as to which one should do the work. In other words, determination of the appropriate unit for collective bargaining was involved. The machinists were given the job, and the carpenters struck, established a picket line and attempted a boycott. The court, by Justice Frankfurter, construed the federal Norris-LaGuardia Act as affecting substantive rights, at least to this extent: The Norris-LaGuardia Act on its face merely limits the jurisdiction of the federal courts to issue injunctions in certain cases, but in the Hutcheson case it is held that since an injunction could not have issued from the federal court if that remedy had been sought in a civil suit, it also follows by reason of the same statute that the acts which were not enjoinable are also not criminal under the Sherman Act. We do not construe this opinion to mean that the federal Norris-LaGuardia Act has affected the substantive law of the states concerning picketing. The author of the opinion in the Hutcheson case in an earlier and valued work, says of the proposed bill (the Norris-LaGuardia Act) that it

"* * * explicity applies only to the authority of the United States court 'to issue any

restraining order or injunction.' All other remedies in federal courts and all remedies in state courts remain available." Frankfurter and Greene, The Labor Injunction, p. 220.

The effect of the Hutcheson case on substantive rights is, we think, limited to the effect which the Norris-LaGuardia Act has upon the construction of the earlier Sherman Act. Even this limited assertion concerning the effect of the federal Norris-LaGuardia Act on substantive rights is cast in doubt by the earlier pronouncement by the writer of the Hutcheson opinion and was challenged in the concurring opinion of Justice Stone and the dissenting opinions of Chief Justice Hughes and Justice Roberts, the dissenters being of the opinion that the provisions of the Sherman Act were not repealed by the Norris-LaGuardia Act. This court has long since construed the Oregon Norris-LaGuardia Act as relating to procedure only. *Starr v. Laundry and Dry Cleaning Workers' Local Union*, 155 Or. 634, 63 P. (2d) 1104, decided March 9, 1937. And see *Dehan v. Hotel and Restaurant Employees and Beverage Dispensers, Local Union*, (La. App.) 159 So. 637, decided March 8, 1935, and *Alliance Auto Service, Inc. v. Cohen*, 341 Pa. 283, 19 A. (2d) 152, decided March 24, 1941.

In *Lauf v. Shinner* it was held:

"The law of the state in which the acts complained of occurred governs the substantive rights of the parties to a suit in a Federal court for injunctive relief." *Lauf v. Shinner*, 303 U. S. 323, 58 S. Ct. 578, 82 L. Ed. 872, decided February 28th, 1938.

See also *Shively v. Garage Employees Local Union*, 6 Wash. (2d) 560, 108 P. (2d) 354, decided December 12, 1940. This, we think, is still the rule subject to

the single exception that in cases involving interstate commerce substantive rights have been affected by the National Labor Relations Act. The Norris-La-Guardia Act does not purport to be an exercise of the power over interstate commerce and does not and could not affect the substantive law of a state in cases involving purely intra-state commerce or industry. Neither the act nor its construction is controlling here. Nor is the Hutcheson case controlling here. Although it was said inter alia that an injunction could not issue under the facts therein set forth, processes now well recognized for the determination of the proper collective bargaining agency were not involved. There was no election or certification and no union shop contract between the employer and a certified agency.

In the case of *Bakery and Pastry Drivers and Helpers Local v. Wohl*, 315 U. S. 769, 62 S. Ct. 816, 86 L. Ed. 1178, decided March 30, 1942, the United States Supreme Court expressed no opinion concerning the existence of a labor dispute. The case will receive further comments in our later consideration of the constitutional issues involved.

The cited cases of *Wallace v. International Union* (supra) and *Starr v. Laundry and Dry Cleaning Workers Local Union* (supra) are not in point upon this issue. In neither of them was the picketing directed against an employer who had entered into a union shop contract with the majority of his employees pursuant to election and certification by the National Labor Relations Board.

The nature of a "labor dispute" within the meaning of the Oregon statute was not considered in *American Federation of Labor v. Bain,* 165 Or. 183, 105 P. (2d) 544, 130 A. L. R. 1278, cited on this point by the defendants.

■ That there is a great diversity of opinion concerning the content of the term ''labor dispute'' must be conceded. That diversity is especially sharp when comparison is made between federal decisions construing the federal Norris-LaGuardia Act and state decisions construing similar state acts. The fact remains, however, that the state, in construing its own statute, is not bound by the construction adopted by the federal courts concerning the similar federal statute and that the federal courts acknowledge themselves to be bound by the construction of the state courts concerning state statutes.

> ''Federal courts are bound by a construction put upon a state statute by the highest court of the state.'' *Lauf v. Shinner* (supra) at p. 873.

Since the agreement between the employer and the bargaining agency provided for the admission into the union of non-member employees, both old and new, it was not subject to the condemnation pronounced by this court against the monopolistic efforts of a union which insisted not only upon a closed shop, but also upon a closed union. *Schwab v. Moving Picture Machine Operators* (supra).

We observe a marked change in the common law and in public policy as expressed by state and federal statutes concerning the validity of union or closed shop contracts, and since the objective of the picketing in the case at bar was to induce a breach of such an agreement the validity of the contract becomes material in determining the legality of the objective of the picketing.

> ''A bargains with a labor union to employ only union labor. The bargain is legal, unless the union has such a monopoly as virtually to deprive non-

union workers of any possibility of employment; and even in that case it is not illegal if a statute legalizes such labor unions." 2 Restatement of the Law of Contracts, Subparagraph 18, § 515, p. 993.

■ The National Labor Relations Act, after defining unfair labor practices of employers engaged in interstate commerce, continues as follows:

"*Provided*, That nothing in sections 151-166 of this title or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in sections 151-166 of this title as an unfair labor practice) to require as a condition of employment membership therein, if such labor organization is the representative of the employees as provided in section 159 (a) of this title, in the appropriate collective bargaining unit covered by such agreement when made." 29 U. S. C. A. § 158.

Thus, the public policy of the United States concerning matters involving interstate commerce is made clear. Union shop contracts executed under the conditions disclosed in this case are approved.

See also cases cited in Labor Disputes and Collective Bargaining by Ludwig Teller, Section 170, and notes. In 1 Teller, (supra) section 87, at p. 259, it is said:

"The law has generally held legal a strike to compel observance of a valid collective bargaining agreement by an employer. In the case of strikes to compel observance by employers of closed shop contracts, the legality of the strike would depend upon the legality of the agreement. Thus it has been held that a strike to compel observance of an illegal closed shop contract is itself illegal."

A strike in violation of a collective bargaining contract is generally held unlawful. 1 Teller (supra) § 86, p. 256.

Commenting upon the case of *Stillwell Theater Inc. v. Kaplan*, 259 N. Y. 405, 184 N. E. 93, decided in 1932, an early case in which the court refused to enjoin picketing by an A. F. of L. union notwithstanding the fact that the employer had entered into a collective bargaining agreement with another union, Ludwig Teller writes as follows:

"The holding in the Stillwell case has been assailed as serving unjustly to subject the rights of the employer to internal conflicts of labor." (Citing cases.) 1 Teller (supra) § 131, p. 409.

"The Stillwell decision probably proceeded upon the court's desire, however, to forestall the development of employer-dominated unions as springboards for injunctive relief against picketing by bona fide labor unions." 1 Teller (supra) § 131, p. 410.

Referring to contentions which have been advanced concerning the legality of picketing in connection with jurisdictional disputes which have arisen subsequent to the enactment of the National Labor Relations Act, the author writes:

"On three counts, therefore, it is contended that the holding of the Stillwell case should become bad law. In the first place, the Labor Relations Acts are asserted to have undertaken the task which the court in the Stillwell case may have refused to assume—that of determining whether a given labor organization is or is not a bona fide, undominated and independent union. In the second place, they have provided for the selection of one and only one representative for the purpose of

collective bargaining, and finally, they have provided that only this bargaining representative, so selected, shall bargain collectively with the employer. Under this view-point, the pickets in the Stillwell case would perforce be treated with much less deference today. They would be interfering with the performance of a contract entered into by direction or at least under protection of law, to wit, the New York State Labor Relations Act. Moreover, they would in effect be coercing the performance of an illegal act, for the employer is forbidden by law to bargain with any but the proper bargaining representative of his employees.'' 1 Teller (supra) § 132, pp. 411, 412.

Again, it is said by the same author:

''The wisdom of holding suits, whether to enforce collective bargaining agreements or to enjoin their further violation, to constitute labor disputes under the anti-injunction act, is doubtful. It cannot be denied that a rule holding such suits to constitute 'labor disputes' impairs the legal enforceability of collective bargaining agreements. Again, anti-injunction legislation evidences a purpose, if its historical background is considered, of dealing with labor disputes and the practice of using a court of chancery as a policing power in connection with such disputes. It is foreign both to the history and context of anti-injunction statutes to extend their application to litigation relating to collective bargaining agreements. Finally, it is difficult to understand the nature of the obligation to make efforts at settlement (an obligation which usually preconditions the issuance of injunctions under modern anti-injunction enactments) in the face of the violation of a collective bargaining agreement arrived at by negotiations and with the view toward effecting a settlement of a controversy.'' 1 Teller (supra) page 527, as amended in 1 Teller (supplement) 1941, § 177.

The same author in another place says:

"State anti-injunction statutes have generally been construed to affect procedure only, leaving unimpaired the prior substantive law. A 'lawful labor objective' is a 'labor dispute' under anti-injunction laws; conversely, an unlawful labor objective does not constitute a 'labor dispute' and may be enjoined in spite of anti-injunction laws." 56 Har. L. Rev. 211, and footnote.

█ In carrying out the provisions of a valid contract by discharging non-union employees and in thereafter refusing to violate the contract by re-employing them, we find no taint of unfairness on the part of the plaintiff, and its conduct cannot therefore be deemed an excuse for the picketing which was being done for an unlawful purpose.

"There may be some question, at least there is some contradiction in the authorities, as to whether doing or refusing to do certain acts render an employer 'unfair' but there certainly can be no controversy over the proposition that an employer is not 'unfair' when his only act is refusing to do and refraining from doing what the law forbids him from doing." *Wisconsin Employment Relations Board v. Milk & Ice Cream Drivers & Dairy Employees Union*, 238 Wisc. 379, 299 N. W. 31, at p. 37, June 25th, 1941.

In *Eastwood-Nealley Corporation v. International Association of Machinists*, 124 N. J. Eq. 274, 1 A. (2d) 477, September 30, 1938, referring to the provisions of the National Labor Relations Act, the court said:

"These provisions of the statute, in my opinion, make it unlawful for an employer (whose business substantially affects interstate commerce) to enter into a closed shop contract except with a union which is the representative selected for bargaining purposes by a majority of the employes. Not un-

lawful in the sense that any individual is given a right of action on the statute, but unlawful in the sense of contrary to the policy of the United States as determined by Congress. A strike and picketing, intended to induce the employer to engage in an 'unfair labor practice' as defined by Congress, or to act contrary to the policy of the United States, are unlawful under the law of New Jersey because they have an unlawful purpose.'' *Eastwood-Nealley Corporation v. International Association of Machinists* (supra) at p. 279.

''We agree fully with the contention of the plaintiff that there must be a reasonable justification for picketing. There must be an actual bona fide dispute. Picketing must be peacefully carried on and it must be for a lawful purpose.'' *Wallace v. International Association,* 155 Or. 652, at p. 663, 664, 63 P. (2d) 1090, December 29th, 1936.

■ Where an employer, innocent of any unfair labor practice, enters into a union shop contract with an ''open union'' which has been chosen and continues to be supported by a majority of its employees and which is the authorized agent of all employees for collective bargaining, having been duly certified as such by the National Labor Relations Board after an election held pursuant to the statute, and when under such conditions the employee members of a rival minority union picket the employer's business for the sole purpose of causing the employer to violate the contract by re-employing discharged minority employees who might have joined but refused to join the majority union, and who were discharged pursuant to the contract because of such refusal, we hold that the pre-existing ''labor dispute'', if any, has ceased to exist and that under such conditions the picketing is for an unlawful purpose, and the Oregon anti-injunction act is not applicable.

The conclusion at which we have arrived differs radically from the decisions of courts which have by injunction sought to limit the effective employment by unions of the instruments of industrial conflict. The union shop contract has long been a prime objective of union policy. The injunction in this case is an aid to the effectuating of that policy. Any union which may by democratic processes secure the right of representation of the employees in a given unit has a vital interest in the unobstructed enforcement of contracts which it may secure in the interest of the employees.

Whether certification by a Labor Relations Board is an indispensible element of the case if the foregoing conclusion is to be reached need not be decided in this litigation. That element is present whether essential or not.

■ As a second proposition the defendants assert that the right to peacefully picket is an exercise of the right of freedom of speech.

It cannot be doubted that

"Picketing as an incident to a labor dispute is, at least in some of its phases, an exercise of the right of freedom of speech." *American Federation of Labor v. Bain,* 165 Or. 183, at p. 200, 106 P. (2d) 544, 130 A. L. R. 1278.

But whether picketing under the circumstances disclosed in this case and which is not incidental to a "labor dispute" is protected by the constitutional right of free speech has never been determined by this court or by the supreme court of the United States.

The bearing of the recent decisions of the United States Supreme Court upon the case at bar may best be illustrated by a classification of the cases. First, we have a group of cases involving the direct en-

forcement of state statutes specifically directed against picketing and which are challenged as violating the right of free speech. *Thornhill v. Alabama,* 310 U. S. 88, 60 S. Ct. 736, 84 L. Ed. 1093 (1940) ; *Carlson v. California,* 310 U. S. 106, 60 S. Ct. 746, 84 L. Ed. 1104 (1940), and *American Federation of Labor v. Bain* (supra). Such cases are not controlling when, as here, the constitutional challenge is directed against the conventional action of a court of equity in enjoining specific conduct of specific persons under specific circumstances. The distinction is made clear in the case of *Milk Drivers Union v. Meadowmoor Dairies,* 312 U. S. 287, 61 S. Ct. 552, 85 L. Ed. 836, 132 A.L.R. 1200. In upholding the power of a state court ''to enjoin acts of picketing in themselves peaceful when they are enmeshed with contemporaneously violent conduct which is concededly outlawed'', the supreme court, by Mr. Justice Frankfurter, said :

> ''The Constitution is invoked to deny Illinois the power to authorize its courts to prevent the continuance and recurrence of flagrant violence, found after an extended litigation to have occurred under specific circumstances, by the terms of a decree familiar in such cases. Such a decree, arising out of a particular controversy and adjusted to it, raises totally different constitutional problems from those that would be presented by an abstract statute with an overhanging and undefined threat to free utterance. To assimilate the two is to deny to the states their historic freedom to deal with controversies through the concreteness of individual litigation rather than through the abstractions of a general law.'' *Milk Wagon Drivers Union v. Meadowmoor Dairies,* (supra) at p. 841.

The text of the three decisions which declared anti-picketing statutes to be invalid discloses that the

conclusions were largely based upon considerations having no applicability to the issues which arise in the injunction cases. The statutes and ordinances were stricken down because of their generality.

"A like threat is inherent in a penal statute, like that in question here, which does not aim specifically at evils within the allowable area of State control, but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech or of the press."

"The statute as thus authoritively construed and applied leaves room for no exceptions based upon either the number of persons engaged in the proscribed activity, the peaceful character of their demeanor, the nature of their dispute with an employer, or the restrained character and the accurateness of the terminology used in notifying the public of the facts of the dispute." *Thornhill v. Alabama* (supra) at p. 1100.

In considering the Oregon anti-picketing law, O. C. L. A. 102-906 et seq., this court said:

"* * * the fundamental defect of the statute, in the light of the Supreme Court's decision is, that it is not aimed at specific evils which the state without doubt has power to correct; but the prohibition, to the extent that it applied, is as broad as that condemned in the Thornhill and Carlson cases, and, like the enactments there considered, 'sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech or of the press.'" *American Federation of Labor v. Bain* (supra) at p. 208.

Though clearly distinguishable from the case at bar, the decisions involving anti-picketing statutes are, of course, important as disclosing the new constitutional philosophy of the supreme court. It is

evident that the courts in question intended to make no sweeping declaration which would divest the courts of power to impose reasonable and necessary restrictions on the conduct of parties in labor controversies.

"We are not now concerned with picketing en masse or otherwise conducted which might occasion such imminent and aggravated danger to these interests as to justify a statute narrowly drawn to cover the precise situation giving rise to the danger. Compare American Steel Foundries v. Tri-City Central Trades Council, 257 U. S. 184, 205, 66 L. ed. 189, 197, 42 S. Ct. 92, 27 ALR 360. Section 3448 in question here does not aim specifically at serious encroachments on these interests and does not evidence any such care in balancing these interests against the interest of the community and that of the individual in freedom of discussion on matters of public concern." *Thornhill v. Alabama* (supra) at p. 1104.

"The power and duty of the State to take adequate steps to preserve the peace and protect the privacy, the lives, and the property of its residents cannot be doubted. But the ordinance in question here abridges liberty of discussion under circumstances presenting no clear and present danger of substantive evils within the allowable area of State control." *Carlson v. California* (supra) at p. 1108.

"No right is held absolutely—not even the right to speak freely." (Citing Mr. Justice Holmes in Schenck v. United States, 249 U. S. 47, 52.) *American Federation of Labor v. Bain* (supra), at p. 208.

The case of *Senn v. Tile Layers Protective Union, Local No. 5,* 301 U. S. 468, 57 S. Ct. 857, 81 L. Ed. 1229, decided May 4, 1937, involves the validity of a statute relative to picketing, but cannot be classified with the first group, supra. In the Senn case a Wisconsin statute provided in substance that peaceful picketing is

legal and denied the right of courts of equity to enjoin it. The question for decision was whether the statute of Wisconsin as construed by the court violated the Fourteenth Amendment. The United States Supreme Court said:

"The judgment of the highest court of the state establishes that both the means employed and the end sought by the union are legal under its law."

It was held that the state may constitutionally legalize picketing. It is an entirely different matter to say that a state may not declare certain types of picketing to be illegal. In support of this latter contention reliance is placed upon the oft-quoted and, we think, sometimes misunderstood pronouncement in the Senn case:

"Clearly the means which the statute authorizes—picketing and publicity—are not prohibited by the Fourteenth Amendment. Members of a union might, without special statutory authorization by a State, make known the facts of a labor dispute, for freedom of speech is guaranteed by the Federal Constitution."

 Obviously, picketing in general is not prohibited by the Fourteenth Amendment, nor is it now prohibited by the common law. Again, obviously, no statute is required to authorize picketing. What remains of the famous pronouncement is merely this: That the right to make known the facts of the labor dispute is protected by the constitutional right of free speech. That the court did not intend to say that all forms of picketing are under the aegis of free speech is made clear.

"The state may, in the exercise of its police power regulate the methods and means of publicity as well as the use of public streets."

"The statute provides that the picketing must be peaceful; and that term as used implies not only absence of violence, but absence of any unlawful act." *Senn v. Tile Layers Protective Union* (supra) at p. 1236.

The second group of cases approaches somewhat more closely the situation in the case at bar. We refer to the state statutes applicable to picketing through creation of administrative agencies similar to the National Labor Relations Board. They include *Hotel & Restaurant Employees' International Alliance, Local No. 122, v. Wisconsin Employment Relations Board*, 315 U. S. 437, 62 S. Ct. 706, 86 L. Ed. 946, decided March 2, 1942, and *Allen-Bradley Local No. 1111, United Electrical, Radio & Machine Workers of America v. Wisconsin Employment Relations Board*, 315 U. S. 740, 62 S. Ct. 820, 86 L. Ed. 1154, decided March 30, 1942, and *Wisconsin Employment Relations Board v. Milk & Ice Cream Drivers, etc. Union* (supra). In the Hotel & Restaurant Employees case, the United States Supreme Court recognized the power of the state labor board to issue an administrative injunction against picketing where the order did not prohibit peaceful picketing. The court said:

"What public policy Wisconsin should adopt in furthering desirable industrial relations is for it to say, so long as rights guaranteed by the Constitution are respected."

No jurisdictional dispute was involved.

In *Allen-Bradley Local No. 1111 v. Wisconsin Employment Relations Board* (supra) the only question for consideration was whether an order of the Wisconsin Employment Relations Board entered under the Wisconsin Employment Peace Act was unconstitu-

tional and void as being repugnant to the provisions of the National Labor Relations Act. The Wisconsin statute was held valid. The statute provided in part that it shall be an unlawful labor practice

"To hinder or prevent, by mass picketing, threats, intimidation, force or coercion of any kind the pursuit of any lawful work or employment, or to obstruct or interfere with entrance to or egress from any place of employment, or to obstruct or interfere with free and uninterrupted use of public roads, streets, highways, railways, airports, or other ways of travel or conveyance." *Allen-Bradley Local No. 1111 v. Wisconsin Employment Relations Board* (supra) p. 1160.

Under the provisions of the statute the state board found the union guilty of unfair labor practices in that it had conducted mass picketing, obstructed and interfered with entrance and egress from the factory and other like actions. In affirming a decision of the supreme court of Wisconsin which sustained the order of the board, the court said:

"We agree with the statement of the United States as amicus curiae that the federal Act was not designed to preclude a State from enacting legislation limited to the prohibition or regulation of this type of employee or union activity. The Committee Reports on the federal Act plainly indicate that it is not "a mere police court measure" and that authority of the several states may be exerted to control such conduct. Furthermore, this Court has long insisted that an intention of Congress to exclude States from exerting their police power must be clearly manifested."

"Indeed if the portions of the state Act here invoked are invalid because they conflict with the federal Act, then so long as the federal Act is on the books it is difficult to see how any State could under any circumstances regulate picketing or dis-

order growing out of labor disputes of companies whose business affects interstate commerce." *Allen Bradley Local No. 1111 v. Wisconsin Employment Relations Board* (supra) at p. 1164 and 1165.

In *Wisconsin Employment Relations Board v. Milk & Ice Cream Drivers & Dairy Employees Union, Local No. 225* (supra) the employer had instituted proceedings before the Wisconsin Labor Relations Board alleging unfair labor practices by the defendant A. F. of L. union and seeking a cease and desist order restraining such conduct. The board made the requested order. The circuit court, pursuant to statute, entered a judgment of enforcement. The defendant union appealed to the Wisconsin supreme court. The company had in the past operated under an "all-union contract" with the defendant union, which had been the bargaining agent for the company's employees. The company, pursuant to the contract, gave notice of termination and informed the union that it would enter into a new contract but would not include therein an "all-union" provision unless such provision were desired by three-fourths of its employees as required by section 111.06 (1) (c) Statutes. The company petitioned the state board for a referendum, which was held, and the vote was against the all-union contract. The employer therefore refused to execute such a contract. The defendant union nevertheless insisted on that provision and called a strike and established a picket line. The trial court specifically found that the picketing was for the ultimate purpose of compelling the company to enter into an all-union contract. The trial court enjoined the picketing, and the supreme court affirmed. The court said:

"Par. (c) of subsec. (1) of said section [111.06] by necessary implication prescribes an

employer's entering into an all-union labor contract unless three-fourths of his employees constituting a collective bargaining unit have voted therefor." *Wisconsin Employment Relations Board v. Milk & Ice Cream Drivers & Dairy Employees Union* (supra) at p. 38.

The Wisconsin supreme court on appeal gave full consideration to the defendant's contention that the restraining order violated defendant's rights of free speech. The court said:

"We find nothing inconsistent between the provisions of the cease and desist order covered by Pars. (f) and (g) of sec. 111.06 (2) and the Thornhill, Carlson and Swing cases, in which the union so confidently relies. In none of these cases was the picketing involved carried on for an unlawful purpose." *Wisconsin Employment Relations Board v. Milk & Ice Cream Drivers & Dairy Employees Union* (supra) at p. 39.

The third group of cases which merits attention comprises decisions directly involving injunctions against picketing unaffected by anti-picketing statutes. In *Milk Wagon Drivers Union of Chicago, Local 753 v. Meadowmoor Dairies,* 312 U. S. 287, 61 S. Ct. 552, 85 L. Ed. 836, 132 A. L. R. 1200, decided March 17, 1941, it was held that the courts of a state may enjoin acts of picketing in themselves peaceful

"* * * when they are enmeshed with contemporaneously violent conduct which is concededly outlawed."

The court said:

"On the other hand, if they [the people of Illinois] choose to leave their courts with the power which they have historically exercised, within the circumscribed limits which this opinion defines, and we deny them that instrument of government,

that power has been taken from them permanently. Just because these industrial conflicts raise anxious difficulties, it is most important for us not to intrude into the realm of policy-making by reading our own notions into the Constitution." *Milk Wagon Drivers Union of Chicago v. Meadowmoor Dairies* (supra) at p. 844.

In *American Federation of Labor v. Swing*, 312 U. S. 321, 61 S. Ct. 586, 85 L. Ed. 855, decided February 10, 1941, the court said:

"The constitutional guaranty of freedom of discussion is infringed by a judicial policy of a state to forbid resort to peaceful persuasion through picketing where there is no immediate employer-employee dispute, as in the case of attempted unionization of a business employing non-members of the union."

The court said:

"We are asked to sustain a decree which for purposes of this case asserts as the common law of a state that there can be no 'peaceful picketing or peaceful persuasion' in relation to any dispute between an employer and a trade union unless the employer's own employees are in controversy with him." *American Federation of Labor v. Swing* (supra) at pp. 855, 857.

The court acknowledged

"* * * that a state has ample power to regulate the local problems thrown up by modern industry and to preserve the peace."

But it denied the power of the state to draw the

"* * * circle of economic competition between employers and workers so small as to contain only an employer and those directly employed by him."

The case did not involve any jurisdictional dispute, any union shop contract or any certification. No contention has been made in the case at bar such as was unsuccessfully asserted in the Swing case.

In the case of *O'Neil v. Building Service Employees International Union,* 9 Wash. (2d) 507, 115 P. (2d) 662, 137 A. L. R. 1102, cited by the defendants, the court reluctantly follows the Swing case. It is not important in the present controversy.

The case of *Bakery & Pastry Drivers and Helpers Local 802 v. Wohl,* 315 U. S. 769, 62 S. Ct. 816, 86 L. Ed. 1178, decided March 30, 1942, has already been discussed. No jurisdictional dispute, union shop contract, election or certification was involved. Upon the constitutional issue the court held that only peaceful picketing was involved and that it was protected under the circumstances of that case under the right of free speech. However, the court said:

"We ourselves can perceive no substantive evil of such magnitude as to mark a limit to the right of free speech which the petitioners sought to exercise. The record in this case does not contain the slightest suggestion of embarrassment in the task of governance; there are no findings and no circumstances from which we can draw the inference that the publication was attended or likely to be attended by violence, force or coercion, or conduct otherwise unlawful or oppressive; and it is not indicated that there was an actual or threatened abuse of the right to free speech through the use of excessive picketing. A state is not required to tolerate in all places and all circumstances even peaceful picketing by an individual. But so far as we can tell, respondents' mobility and their insulation from the public as middlemen made it practically impossible for petitioners to make known their legitimate grievances to the public whose patronage was

sustaining the peddler system except by the means here employed and contemplated; and those means are such as to have slight, if any, repercussions upon the interests of strangers to the issue." *Bakery & Pastry Drivers and Helpers Local 802 v. Wohl* (supra) at p. 1184.

We quote also from the concurring opinion of Justice Douglas, concurred in by Justices Black and Murphy.

"We recognized that picketing might have a coercive effect: 'It may be that effective exercise of the means of advancing public knowledge may persuade some of those reached to refrain from entering into advantageous relations with the business establishment which is the scene of the dispute. Every expression of opinion on matters that are important has the potentiality of inducing action in the interests of one rather than another group in society'.

"Picketing by an organized group is more than free speech, since it involves patrol of a particular locality and since the very presence of a picket line may induce action of one kind or another, quite irrespective of the nature of the ideas which are being disseminated. Hence those aspects of picketing make it the subject of restrictive regulation." *Bakery & Pastry Drivers and Helpers Local 802 v. Wohl* (supra) at p. 1184.

It was contended in the Wohl case that the real basis of the decision of the New York Court of Appeals was revealed in a subsequent opinion of that court in the case of *Opera-on-Tour v. Weber*, 285 N. Y. 348, at p. 357, 34 N. E. (2d) 349, 136 A. L. R. 267. In the latter case the New York court said, concerning its opinion in the Wohl case:

"We held that it was an unlawful labor objective to attempt to coerce a peddler employing no em-

ployees in his business and making approximately thirty-two dollars a week, to hire an employee at nine dollars a day for one day a week."

But the supreme court said:

"This lacks the deliberateness and formality of a certification * * *."

Consequently, the alleged unlawfulness of the labor objective in the Wohl case was not considered by the supreme court. The author of the monumental work on labor disputes and collective bargaining, in a recent comment on the Wohl case, says:

"Apparently, then, the Supreme Court would have sustained the injunction had the New York Court of Appeals made a finding that the picketing was for an unlawful labor objective."

And again, indicating the probable course of constitutional decisions, he says:

"The patience of the Supreme Court may not be expected to endure injunctions restraining picketing carried on for higher wages, for shorter hours, for collective bargaining, or for organizing establishments. Subjects of contentious policy, however, such as the closed shop or labor's quarrel with mechanical devices, are for the states to determine even if peaceful picketing must be enjoined to make the given determination of policy effective." Ludwig Teller, Picketing and Free Speech, 56 Har. L. Rev. 180, at pp. 193, 209.

The last two cases within the classification now under consideration are of special importance. They are *Carpenters & Joiners Union of America, Local No. 213 v. Ritter's Cafe,* 315 U. S. 722, 62 S. Ct. 807, 86 L. Ed. 1143, decided March 30, 1942, and *Schwab v. Moving Picture Machine Operators,* 165 Or. 602, 109 P. (2d)

600, decided January 28, 1941. In the Ritter's Cafe case the facts were as follows: Ritter was the owner and operator of a restaurant. He entered into a contract with Plaster for the construction of a building a mile and a half away from the cafe and which construction was wholly unconnected with Ritter's cafe business. As to the restaurant work there was no controversy between Ritter and his employees or their union, but because Plaster employed non-union labor, members of the union began to picket Ritter's cafe. The picketing was done

> "* * * for the avowed purpose of forcing and compelling plaintiff (Ritter) to require the said contractor, Plaster, to use and employ only members of the defendant unions on the building under construction."

Picketing under these conditions was held to constitute a violation of the Texas anti-trust law and was enjoined by the state court. On appeal the United States supreme court said:

> "The economic contest between employer and employee has never concerned merely the immediate disputants. The clash of such conflicting interests inevitably implicates the well-being of the community. Society has therefore been compelled to throw its weight into the contest. The law has undertaken to balance the effort of the employer to carry on his business free from the interference of others against the effort of labor to further its economic self-interest. And every intervention of government in this struggle has in some respect abridged the freedom of action of one or the other or both."

> "But the circumstance that a labor dispute is the occasion of exercising freedom of expression does not give that freedom any greater constitutional sanction or render it completely inviolable.

Where, as here, claims on behalf of free speech are met with claims on behalf of the authority of the state to impose reasonable regulations for the protection of the community as a whole, the duty of this Court is plain.''

''But recognition of peaceful picketing as an exercise of free speech does not imply that the states must be without power to confine the sphere of communication to that directly related to the dispute.''

''Restriction of picketing to the area of the industry within which a labor dispute arises leaves open to the disputants other traditional modes of communication. To deny the states the power to draw this line is to write into the Constitution the notion that every instance of peaceful picketing—anywhere and under any circumstances—is necessarily a phase of the controversy which provoked the picketing. Such a view of the Due Process Clause would compel the states to allow the disputants in a particular industrial episode to conscript neutrals having no relation to either the dispute or the industry in which it arose.

''In forbidding such conscription of neutrals in the circumstances of the case before us, Texas represents the prevailing, and probably the unanimous, policy of the states. We hold that the Constitution does not forbid Texas to draw the line which has been drawn here. To hold otherwise would be to transmute vital constitutional liberties into doctrinaire dogma. We must be mindful that 'the rights of employers and employees to conduct their economic affairs and to compete with others for a share in the products of industry are subject to modification or qualification in the interests of the society in which they exist. This is but an instance of the power of the State to set the limits of permissible contest open to industrial combatants.' Thornhill v. Alabama.'' *Carpenters & Joiners Union of America v. Ritter's Cafe,* (supra) at pp. 1146, 1148.

A similar constitutional ruling was made by this court in the case of *Schwab v. Moving Picture Machine Operators* (supra). In that case peaceful picketing was enjoined because, as in the case at bar, the defendants were found to be engaged in "concerted action to accomplish an unlawful purpose." It was held that the Thornhill, Carlson and Bain cases were not applicable and that the injunction did not infringe the defendants' rights of free speech.

In the case of *R. H. White Co. v. Murphy*, 310 Mass. 510, 38 N. E. (2d) 685, decided January 2, 1942, the contention by the defendant union that picketing was protected under the doctrine of free speech was rejected. The facts differed from those in the case at bar, but the principle is identical. In the case at bar the picketing was for the purpose of inducing the plaintiff to violate a valid union shop contract. In the Massachusetts case the picketing was for the purpose of inducing the employer to perform an invalid union shop contract. The picketing was enjoined. The employer and an A. F. of L. union had been operating under a closed shop contract which expired January 31, 1941. Prior to the expiration date the union notified the plaintiff that it wished to negotiate a new contract. At about the same time a C. I. O. union had filed a petition with the State Labor Relations Commission requesting that it be certified as the representative of the plaintiff's employees for the purpose of collective bargaining. The plaintiff

> "* * * took a neutral position, being willing to bargain with whichever union should be certified by the commission."

The commission took the petition under advisement. While the proceedings for certification were still pend-

ing the A. F. of L. union voted to authorize a strike and picketing unless a union shop contract should be executed. Owing to the fear of labor trouble the employer signed the contract. The C. I. O. union in fact represented a majority of the warehouse employees. Thereafter the commission rendered a decision determining the unit appropriate for the purpose of collective bargaining and ordering an election within said unit. The A. F. of L. unions then demanded that the plaintiff discharge all employees who were not members of the A. F. of L. union. The election was held, the C. I. O. union prevailed and the board certified that it had been selected by a majority of the warehouse employees as a representative for collective bargaining. The A. F. of L. union peacefully picketed the plaintiff's store. The issues presented were:

> "* * * whether the contract in question is invalid and, if so, whether peaceful picketing by the defendants for the purposes of inducing the plaintiff to perform the contract properly can be enjoined."

The court said:

> "It is settled that certification imposes the affirmative duty upon the employer to bargain with the certified union, and the negative duty of abstaining from bargaining with any other union." (Citing cases.)

The court determined as a matter of fact that prior to the demand for or execution of the closed shop contract the majority of the employees had become members of the C. I. O. union. It will be observed that the finding by the court related to the facts prior to the date of the election. The court said:

> "It follows from what has been said that the contract was invalid as one entered into by the

plaintiff with locals of a union that did not in fact represent a majority of the plaintiff's warehouse employees, and that, having been entered into while there was a dispute as to representation and the petition for certification was pending before the commission, it was not a bar to certification. Black Diamond Steamship Corp. v. National Labor Relations Board, 2 Cir. 94 F. 2d 875, certiorari denied, 304 U. S. 579, 58 S. Ct. 1044, 82 L. Ed. 1542. See also cases cited in 2 Teller, Labor Disputes and Collective Bargaining, § 335, page 904. To uphold the contract in those circumstances would be to sanction an unfair labor practice, to set aside the action of the commission and thus to defeat the purposes of the statute. See International Association of Machinists v. National Labor Relations Board, 311 U. S. 72, 75, 61 S. Ct. 83, 85 L. Ed. 50. Unfair labor practices 'cannot operate to change the bargaining representatives previously selected by the untrammeled will of the majority.' Oughton v. National Labor Relations Board, 3 Cir., 118 F. 2d 486, 490.

"The defendants contend, however, that even though the contract be invalid, it is the function of the commission and not of the courts to set it aside, because the commission is given exclusive jurisdiction by G. L. (Ter. Ed.) c. 150 A. § 6 (a), to bring proceedings to prevent unfair labor practices. We are of opinion, however, that by refusing to enforce the contract the judge did not infringe the jurisdiction of the commission. It was appropriate to consider the question of the validity of the contract in determining whether it should be enforced, and there is nothing in the labor relations act restricting that inherent power of a court of equity. See Devon Knitwear Co., Inc., v. Levinson, 173 Misc. 779, 781, 19 N. Y. S. 2d 102; 2 Teller, Labor Disputes and Collective Bargaining, § 271, and cases cited." *R. H. White Co. v. Murphy* (supra) at p. 690.

Concerning the constitutional issue, the court said:

"In this respect the sole question is whether under the constitutional guaranty of freedom of speech a right exists to picket the plaintiff's places of business for the purpose of persuading or inducing it to discharge a majority of its employees in violation of the provisions of the State labor relations act, which like the National labor relations act is specifically expressed to be based upon broad grounds of public policy."

The court considered the Thornhill, Carlson, Senn and Swing cases (all supra), and then said:

"We are of the opinion that none of the cases relied upon by the defendants, which we have already discussed, is authority for any principle that picketing by workmen in concert to persuade or induce an employer to do an unlawful act, one condemned by statute as an unfair labor practice and contrary to the defined public policy of the Commonwealth and of the nation, is permissible under the constitutional guaranty of freedom of Speech, or otherwise."

"To conform to the defendants' demands, compliance with which they sought to effect by picketing, it is manifest that the plaintiff would have to engage in an unfair labor practice as defined by the statutes just referred to, and in contravention thereof to discharge over three fourths of the employees involved, and to bargain with the defendants under the contract in question which was of no force and effect, and to refuse to bargain with the certified representative of the employees as defined in the proceedings of the commission and as required in law; in brief, to do something it cannot legally do."

"It follows from what has been said that the picketing in the present case was for an unlawful purpose. There was therefore no error in the order for final decree, made by the judge. Bloedel

Donovan Lumber Mills v. International Woodworkers of America, Local No. 46, 4 Wash 2d 62, 102 P. 2d 270; Wisconsin Employment Relations Board v. Milk & Ice Cream Drivers & Dairy Employees Union, June 25, 1941, 238 Wis. 379, 299 N. W. 31; Oberman & Co., Inc., v. United Garment Workers of America, D. C. 21 F. Supp. 20; Montgomery Ward Employees' Association v. Retail Clerks International Protective Association, D. C. 38 F. Supp. 321; Am. Law Inst. Restatement: Torts § 794. Compare Fur Workers Union, Local No. 72 v. Fur Workers Union No. 21238, 122 App. D. C. 70, 105 F. 2d 1, 16, affirmed, per curiam sub nomine Fur Workers Union No. 21238 v. Fur Workers Union Local No. 72, 308 U. S. 522, 60 S. Ct. 292, 84 L. Ed. 443.'' *R. H. White Co. v. Murphy* (supra) at pp. 691, 692.

See also *Borden Co. v. Local 133 of International Brotherhood* (Texas) 152 S. W. (2d) 828 (1941) and 2 Bill of Rights Review 59.

The other recent decisions of the United States supreme court are only of indirect significance in the case at bar. Where they do not involve labor disputes they are significant only as indicating the new philosophy of the supreme court concerning the rights of free speech. A few quotations will disclose that the supreme court of the United States has repeatedly recognized that the right of free speech is not absolute, but must be harmonized with other fundamental rights also guaranteed by the constitution.

''They are not absolutes to be exercised independently of other cherished privileges, protected by the same organic instrument. Conflicts in the exercise of rights arise and the conflicting forces seek adjustments in the courts, as do these parties, claiming on the one side the freedom of religion, speech and the press, guaranteed by the Fourteenth Amendment, and on the other the right to employ

the sovereign power explicitly reserved to the State by the Tenth Amendment to ensure orderly living without which constitutional guarantees of civil liberties would be a mockery. Courts, no more than Constitutions, can intrude into the consciences of men or compel them to believe contrary to their faith or think contrary to their convictions, but courts are competent to adjudge the acts men do under color of a constitutional right, such as that of freedom of speech or of the press or the free exercise of religion and to determine whether the claimed right is limited by other recognized powers, equally precious to mankind. So the mind and spirit of man remain forever free, while his actions rest subject to necessary accommodation to the competing needs of his fellows." *Jones v. Opelika,* 316 U. S. 584, 62 S. Ct. 1231, 86 L. Ed. 1691, at p. 1699, 141 A. L. R. 514, decided June 8, 1942.

"Whether, and to what extent, one may promote or pursue a gainful occupation in the streets, to what extent such activity shall be adjudged a derogation of the public right of user, are matters for legislative judgment." *Valentine v. Chrestensen,* 316 U. S. 52, 62 S. Ct. 920, 86 L. Ed. 1262, at p. 1265, decided April 13, 1942.

"The right of free speech is not absolute at all times and under all circumstances, and does not include the use of lewd and obscene, profane, libelous and other words which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Chaplinsky v. New Hampshire,* 315 U. S. 568, 62 S. Ct. 766, 86 L. Ed. 1031, decided March 9, 1942.

"A statute punishing verbal acts, carefully drawn so as not unduly to impair liberty of expression, is not too vague for a criminal law. Cf. Fox v. Washington, 236 U. S. 273, 277, 59 L. Ed. 573, 575, 35 S. Ct. 383." *Chaplinsky v. New Hampshire* (supra) at p. 1036.

"The law of the state in which the acts complained of occurred governs the substantive rights

of the parties to a suit in a Federal court for injunctive relief."

"Federal courts are bound by a construction put upon a state statute by the highest court of the state." *Lauf v. Shinner,* 303 U. S. 323, 58 S. Ct. 578, 82 L. Ed. at pp. 872, 873.

See also *Cox v. New Hampshire,* 312 U. S. 569, 61 S. Ct. 762, 85 L. Ed. 1049, 133 A. L. R. 1396.

In *National Labor Relations Board v. Federbush Co.,* 121 Fed. (2d) 954, decided July 18, 1941, the decision of the Circuit Court of Appeals for the Second Circuit was written by Judge Learned Hand. The question at issue involved the asserted right of an employer under constitutional provisions to present his views on the subject of unions and unionism. The court said:

"Finally, the respondent argues that the Board's order invaded its privilege of 'free speech' guaranteed by the First Amendment, by making it a wrong under § 8 (1), 29 U. S. C. A. § 158 (1), to present to Napoli the company's views about unions and unionism. National Labor Relations Board v. Ford Motor Co., 6 Cir., 114 F. (2nd) 905. No doubt an employer is as free as anyone else in general to broadcast any arguments he chooses against trade-unions; but it does not follow that he may do so to all audiences. The privilege of 'free speech,' like other privileges, is not absolute; it has its seasons; a democratic society has an acute interest in its protection and cannot indeed live without it; but it is an interest measured by its purpose. That purpose is to enable others to make an informed judgment as to what concerns them, and ends so far as the utterances do not contribute to the result. Language may serve to enlighten a hearer, though it also betrays the speaker's feelings and desires; but the light it sheds will be in some degree clouded,

if the hearer is in his power. Arguments by an employer directed to his employees have such an ambivalent character; they are legitimate enough as such, and pro tanto the privileges of 'free speech' protects them; but so far as they also disclose his wishes, as they generally do, they have a force independent of persuasion. The Board is vested with power to measure these two factors against each other, a power whose exercise does not trench upon the First Amendment.''

Surely, we cannot yet assume that the right of free speech is one thing for an employer but that a basically different principle applies in the case of an employee. If democratic institutions are to survive, underlying principles of freedom must not be tainted by the injection of hostile class-conscious discrimination into the fundamental law. If, in the foregoing quotation from the Federbush case, the word ''employer'' should be read in the place of the word ''employee'' and ''employee'' in the place of ''employer'', the statement would be equally sound. Surely words spoken or written by pickets representing organization of immense power may also be said to have ''a force independent of persuasion'', and if an administrative agency is ''vested with power to measure these two factors against each other'' when the words are spoken by employer, it is not too much to believe that this court may perform a like function when words having a force independent of persuasion are spoken by a picket.

As said by Zechariah Chafee, Jr., in Freedom of Speech in War Time, 32 Har. L. Rev. 932, at p. 959:

''The true boundary line of the First Amendment can be fixed only when Congress and the courts realize that the principle on which speech is classified as lawful or unlawful involves the balancing against each other of two very important

social interests, in public safety and in the search of truth."

In this delicate task of balancing the opposed interests of liberty and national security, to ignore the context of total war and the terrible urgency of unimpeded production for national defense, would be to perform the judicial function in an atmosphere of vacuous insincerity.

"The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree. When a nation is at war many things that might be said in time of peace are such a hindrance to its effort that their utterance will not be endured so long as men fight and that no Court could regard them as protected by any constitutional right." (Chafee, supra, at p. 967.) Justice Holmes in Schenck v. United States (supra).

One of the substantive evils which Congress has a right to prevent, and for the prevention of which the power of the nation is now being asserted, is the breakdown of productive processes in time of national emergency. The search for good things must not cause the loss of all things. If, in time of war, the pure right of free speech not connected with conduct may be somewhat limited in the interests of national safety, it follows of necessity that interests lying on the vague periphery of constitutional right, wherein speech and action are blended, may likewise be subjected to such modest restraint as is involved here.

The decree of the circuit court is affirmed.